**KATHY A. DOCKERY**
**CHAPTER 13 TRUSTEE**
**801 S. FIGUEROA ST., STE. 1850**
**LOS ANGELES, CA 90017**
**PHONE: (213) 996-4450**
**FAX: (213) 996-4426**
**EMAIL: AKOYAMA@LATRUSTEE.COM**

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| IN RE: | CASE NO: 2:22-bk-10291-SK |
| | CHAPTER 13 |
| MARY ALIDA LUZURIAGA, | **STIPULATION FOR SETTLEMENT OF MATTER UNDER FRBP 9019 AND FOR COURT AUTHORIZATION FOR DEBTOR(S) TO APPLY TO THE CALIFORNIA MORTGAGE RELIEF PROGRAM AND AUTHORIZATION FOR USE OF PROGRAM FUNDS; DECLARATION OF AKIHITO KOYAMA IN SUPPORT THEREOF** |
| DEBTOR(S). | |
| | [NO HEARING REQUIRED] |

**TO THE HONORABLE SANDRA R. KLEIN, UNITED STATES BANKRUPTCY**

**JUDGE AND ALL PARTIES IN INTEREST:**

COMES NOW, the Chapter 13 Trustee KATHY A. DOCKERY ("Trustee"), by and

through her undersigned attorney, and the Debtor's[1] attorney of record ROSEANN FRAZEE

---

[1] All references to the "Debtor" also incorporate the plural form "Debtors".

("Attorney") who hereby stipulate for court authorization for Debtor MARY ALIDA

LUZURIAGA ("Debtor") to apply to the California Mortgage Relief Program ("CMRP" or

"Program") and for authorization for use of the Program funds as set forth in detail in the recitals

below.

## RECITALS

1.      The Debtor desires to apply to the CMRP to obtain grant money to cure the

arrearage for the 1st trust deed on the Debtor's principal residence.  The funds for the CMRP

originate from the federal American Rescue Plan Act of 2021, §3206.

2.      If the Debtor's CMRP application is approved, the Program will provide up to

$80,000.00 paid directly from the Program to the holder of the first deed of trust or mortgage on

Debtor's home.  See attached Declaration of Akihito Koyama Page 1, Lines 9-11 and "Exhibit A

Term Sheet".

3.      However, the Debtor's application will not be considered by the CMRP until the

Trustee has signed a permission letter for the Debtor to apply to the program.  The Trustee will

not sign the permission letter as the Trustee does not wish to overstep her limited authority to

administer what may be construed as property of the estate.

4.      The parties acknowledge that a legal issue may exist as to whether or not this

grant in funds is property of the estate pursuant to 11 U.S.C. §§541(a)(7), 1306(a)(1) and 363(b)

and would therefore require court authorization for the Debtor to use property of the estate.

5.      After negotiation, the parties have agreed that settling this matter pursuant to

FRBP 9019 rather than litigating the matter, would benefit the bankruptcy estate, the Debtor and

the holder of the first trust deed or mortgage.

/ / /

/ / /

/ / /

/ / /

6.      In the proposed settlement of this matter, the parties offer the following analysis under the four-factor test set forth in In re: A & C Properties 784 F.2d 1377, 1381 (9th Circ.1986):

(a)  The probability of success in the litigation:

It is unlikely that the Trustee will prevail in litigation as the Debtor cannot exercise "dominion" over the Program funds.  The 9th Circuit Court of Appeals requires the Debtor, as the transferee of the funds, to be able to exercise dominion over an asset for the asset to be property of the estate. The "Dominion Test"[2] requires the following quality in a transferee: "a transferee is one who ... has over the money or other asset, the right to put the money to one's own purposes" and "[t]he inquiry focuses on whether an entity had legal authority over the money and the right to use the money however it wished." In re INCOMNET, INC. 463 F.3d 1064 at 1070.  (9th Circ. 2005).  In the instant case, the Program funds will be sent directly from the Program to the holder of the 1st deed of trust or mortgage pursuant to the requirements of the Program for the sole and mandated purpose of curing or paying down an arrearage caused by COVID-19.  The Debtor will not have "legal authority over the funds and the right to use the funds however he wishes" and therefore the funds will not be property of the estate.

/ / /

/ / /

---

[2] The 9th Circuit Court of Appeals has declined to adopt the "Control" test which has been adopted or combined into a "Dominion and Control" test in other circuits.  "[W]e have applied the dominion test several times, but have declined to adopt the control test." In re INCOMNET, INC. 463 F.3d 1064 at 1069.  (9th Circ. 2005)

(b) <u>The difficulties, if any, to be encountered in the matter of collection</u>:

This factor presents a highly difficult obstacle for the Trustee.  Without court approval of this stipulation, the Debtor's application will be denied and the CMRP will not send funds to the Debtor.  On the other hand, if the stipulation is approved, the stipulated terms authorize that the Debtor use the funds "according to the procedures established by the Program." i.e. the funds will be sent directly to the holder of the first deed of trust or mortgage.  Therefore, the circumstances set forth in this stipulation would abrogate any collection attempt by the Trustee.

(c) <u>The complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it</u>:

Any litigation to resolve the issue of whether or not the Program funds are property of the estate and thus should be turned over to the chapter 13 trustee would be cost prohibitive and lengthy.  This is primarily due to the fact that the Trustee would  have to name the State of California and the United States Government as defendants in an adversary proceeding.  This is necessarily so because the Program funds originate from the federal American Rescue Plan Act of 2021, §3206 and the eligibility and  method of disbursement of the funds were created by the state's California Mortgage Relief Program.  Both entities have an interest in meeting the goals mandated in the Act and the Program.

(d) <u>The paramount interest of the creditors and a proper deference to their reasonable views in the premises</u>:

The holder of the 1st deed of trust or mortgage would greatly benefit from receiving the Program funds as the funds would be used to pay off or pay down the mortgage arrearage in a lump sum.  The Trustee does not anticipate any objection from the holder of the 1st deed of trust or mortgage.

1       7.    The parties do not ask the Court for findings of fact and conclusions of law for

2   any underlying issues which may arise under this stipulation.

3       8.    The parties enter into this stipulation solely for the court to approve the settlement

4   of this matter pursuant to FRBP 9019 which would result in authorization from the Court for the

5   Debtor to apply to the CMRP and for the Debtor to use any funds granted by the CMRP

6   according to the procedures established by the CMRP.

7

8   **STIPULATION**

9       1.    The Debtor is authorized to apply to the California Mortgage Relief Program;

10      2.    If the California Mortgage Relief Program grants funds to the Debtor, the Debtor

11  is authorized to use those funds according to the procedures established by the Program.

12

13  **IT IS SO STIPULATED.**

14  DATED: 6/17/22              CHAPTER 13 TRUSTEE KATHY A. DOCKERY

15

16                             AKIHITO KOYAMA, STAFF ATTORNEY FOR

17                             CHAPTER 13 TRUSTEE KATHY A. DOCKERY

18  DATED: 7/10/22

19

20                             ROSEANN FRAZEE,
                               ATTORNEY FOR THE DEBTOR

21

22

23

24

25

26

27

28

**DECLARATION OF AKIHITO KOYAMA**

I, Akihito Koyama, declare as follows:

1.    I am the senior staff attorney for Kathy A. Dockery, the standing Chapter 13 Trustee in this matter and by virtue thereof, I have personal knowledge of the files and records kept by my office in the regular course of business.  I have personally reviewed the files and records kept by my office in the within case.  The following facts are true and correct and within my own personal knowledge and I could and would testify competently thereto if called to do so.

2.    The Debtor's file includes the "Term Sheet" created by the California Mortgage Relief Program which provides for a detailed description of the Program.  A true and correct copy of the "Term Sheet" is attached hereto an incorporated herein by reference as "Exhibit A".


I declare, under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct.


DATED: 6/17/22    _____
AKIHITO KOYAMA,
SENIOR STAFF ATTORNEY FOR
CHAPTER 13 TRUSTEE KATHY A. DOCKERY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**EXHIBIT A**

28



**CALIFORNIA MORTGAGE RELIEF PROGRAM**

Homeowner Assistance Fund
American Rescue Plan Act of 2021



# TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | EXECUTIVE SUMMARY | 01 |
| 2. | OVERALL PROGRAM DESIGN | 03 |
| 3. | HOMEOWNERS' NEEDS AND ENGAGEMENT | 09 |
| 4. | PERFORMANCE GOALS — MEASURING AND REPORTING | 21 |
| 5. | READINESS | 23 |
| 6. | BUDGET | 37 |
| 7. | RISK MANAGEMENT AND MONITORING | 41 |
| 8. | CONCLUSION | 44 |
| 9. | APPENDIX A: CALIFORNIA MORTGAGE RELIEF PROGRAM TERM SHEET | 45 |
| 10. | APPENDIX B: CALIFORNIA MORTGAGE RELIEF PROGRAM PUBLIC FEEDBACK ANALYSIS | 50 |

# 1. EXECUTIVE SUMMARY

## Administration of Homeowner Assistance Fund

The American Rescue Plan Act of 2021 provides $9.961 billion for a Homeowner Assistance Fund (HAF) to mitigate financial hardships associated with the coronavirus pandemic by providing funds to prevent homeowner mortgage delinquencies, defaults, foreclosures, loss of utilities or home energy services, and displacement. Based on the allocation formula to states established by U.S. Treasury, California will receive $1.055 billion in HAF funds.

The California Housing Finance Agency (CalHFA), through its special-purpose affiliate the CalHFA Homeowner Relief Corporation (CalHRC), will be managing HAF funds on behalf of the State of California given its extensive expertise in the mortgage assistance and homeownership space.

CalHFA has developed the California HAF Mortgage Relief Program proposal ("Proposal") using lessons learned from administering the largest mortgage assistance program in the state's history, Keep Your Home California, as well as feedback received from other state government partners, homeowners, housing counselors, housing advocates, legal aid and mortgage servicers. The Proposal outlines readiness, needs assessment, performance goals, program design and more.

The California Mortgage Relief Program ("Program") is designed as a stopgap measure to avoid preventable foreclosures and displacement of the most vulnerable homeowners that do not have other loss mitigation options, with a focus on serving socially disadvantaged populations. This will complement the various initiatives already announced by United States Federal Government, the State of California, local government and community organizations.

The Program is designed to provide streamlined assistance to fully reinstate mortgage delinquencies, thus providing vulnerable homeowners a fresh start as they pass the COVID-19 forbearance period. The Program will be available to households under 100% of Area Median Income that are either: a) on various forms of public assistance; b) significantly housing burdened; or c) where the servicer has not provided any loss mitigation options for the borrower to stay in their home. Recipients will also be connected to HUD-approved housing counselors.

Given design features, the Program is expected to serve predominantly lower income and socially disadvantaged households. In addition, the Program will use a data-driven approach to target socially disadvantaged and vulnerable homeowners, including targeted marketing and community outreach. A percentage of the allocated funds will be reserved for socially disadvantaged and underserved communities, using various geographic and loan metrics.

In order to get ahead of looming forbearance deadlines, CalHFA plans to launch a pilot phase of the Program in August 2021, using funds from the initial 10% allocation of California's HAF funds.

## The COVID-19 Crisis and its Effects on Homeownership in California

On March 4, 2020, Governor Gavin Newsom declared a State of Emergency as a result of the threat of a global pandemic related to the outbreak of coronavirus illness in the State of California. This Executive Order provided, among other things, that the State must prepare for, respond to, and implement measures to mitigate the spread of coronavirus.

By the spring of 2021, tens of millions of Californians and the state's overall economy had felt the dire effects of the pandemic and its related financial impacts. While the state's economy is bouncing back, millions of individuals are still facing hardships as a direct result of the pandemic, most notably the 1.4 million Californians who are still unemployed and having difficulty making rent or mortgage payments. Since the start of the pandemic, a number of federal and state programs have worked as stopgaps, helping families avoid eviction and mortgage default thus far.[1]

California's unemployment rate rose from 4.3% in February 2020 (before the pandemic) to 7.9% in May 2021, which was substantially higher than the overall U.S. unemployment rate of 5.8% in May 2021.[2] During this period, 4.9% of the mortgages in California went into forbearance, a total of 364,000. This 4.9% forbearance rate ranks 8th among the 15 states with the highest number of total loans in forbearance.[3]

Furthermore, Realtors predict that the pandemic recession could result in up to 60,000 foreclosures in California this year, which would negatively impact the health and well-being of those homeowners experiencing foreclosure and exacerbate the racial wealth gap among socially disadvantaged homeowners.[4] Households of color in California were more likely than white households to be behind on mortgage payments and at higher risk of foreclosure, a situation that "reflect[s] the impact of the pandemic on employment sectors in which [people in households of color] often work."[5] Specifically, 65% of California workers in industries highly affected by the pandemic – retail, restaurants, travel and tourism, arts and entertainment, and personal services – are people of color.[6]

---

1  Lourdes Morales, How Has COVID 19 Affected Renters and Homeowners? California Legislative Analyst Office, January 19, 2021 https://lao.ca.gov/reports/2021/4312/COVID-19-renters-homeowners-011921.pdf
2  California Department of Finance, Finance Bulletin, June 2021 https://www.dof.ca.gov/Forecasting/Economics/Economic_and_Revenue_Updates/documents/2021/Jun-21.pdf
3  Andy Walden. "Deferred Payments During Forbearance Beginning to Erode Equity Positions." Black Knight. February 3, 2021. https://www.blackknightinc.com/blog-posts/deferred-payments-during- forbearance-beginning-to-erode-equity-positions/
4  California Little Hoover Commission, Issue Brief: COVID's Impact on California Housing, April 2021 https://lhc.ca.gov/sites/lhc.ca.gov/files/Reports/258/Report258.pdf
5  Carolina Reid and Meg Heisler. "The Ongoing Housing Crisis: California Renters Still Struggle to Pay Rent Even as Counties Re-Open." Terner Center for Housing Innovation at the University of California, Berkeley. October 2, 2020. https://ternercenter.berkeley.edu/research-and-policy/ongoing-housing-crisis/
6  Sara Kimberlin, Aureo Mesquita, and Alissa Anderson. "California Workers With Less Education, People of Color, and Immigrants are at Greatest Financial Risk due to COVID-19." California Budget & Policy Center. April 2020. https://calbudgetcenter.org/ wp-content/uploads/2020/04/CA_Budget_Center_COVID_worker_ demographics_04152020.pdf

## 2.  Overall Program Design

### 2.1.  Introduction

The U.S. Treasury first issued guidance for the use of the HAF funds on April 14, 2021. As an eligible entity that was approved to participate in HAF, CalHFA entered into a Financial Assistance Agreement with Treasury and received 10% of California's total allocation amount on June 22, 2021. U.S. Treasury opened a portal for states to submit their plans on August 6, 2021, with a submission deadline of August 20, 2021.

In August 2021, CalHFA will run a pilot phase of the Program using funds from that initial allocation of California's HAF funds. Running this pilot will allow CalHFA to do an end-to-end test of the Program, setting up the process with mortgage servicers, while targeting assistance to California homeowners with the most urgent need.

Following this pilot phase, CalHFA will make any necessary process enhancements. With Treasury's approval of this Proposal, CalHFA will then launch the Program in full to serve as many vulnerable homeowners as possible using the full HAF allocation of $1.05 billion.

### 2.2.  Overview of the California Mortgage Relief Program

During CalHFA's community outreach process, California homeowners and other stakeholders consistently ranked mortgage assistance/reinstatement as the top priority for use of HAF funds. For this reason, and based on CalHFA's own assessment of need, the Program takes a holistic approach to assisting homeowners by deploying a streamlined, simplified assistance that fully reinstates mortgage delinquencies. During the application process, homeowners will be encouraged to connect with housing counseling services.

By providing full reinstatement in the form of a one-time grant paid directly to a homeowner's mortgage servicer, as well as providing this connection to housing counseling, CalHFA aims to keep homeowners in their homes and set them up to create a sustainable homeownership outcome for the longer term.

CalHFA's program is also designed to avoid overlap with other assistance programs such as the state's $2 billion in water and energy arrearage payment programs.

During the run of the Program, CalHFA may expand the available uses of funds depending on need, community feedback and availability of funds.

The Program will be available to eligible homeowners statewide and will be heavily focused on ensuring usage by socially disadvantaged communities as well as areas of high homeowner vulnerability, through a system of fund reservation as well as a robust and targeted outreach effort.



**INITIAL ALLOCATION**
$100 Million



**Total Allocation**
$1 Billion

**Overall Program Objectives**

**CalHFA's Program Goals**

- Implement a statewide Program that will assist the state's most vulnerable homeowners that do not have other loss mitigation options.

- Encourage connections with California's effective housing counseling network to complement the assistance with education and create the best possible outcomes for homeowners.

- Prioritize assistance to socially disadvantaged groups who are historically the most vulnerable homeowners and have felt the greatest negative impact from the pandemic.

- Establish a streamlined application process to provide eligible homeowners with a simple and effective method for receiving assistance, especially those in the most difficult financial situations.

**2.3.  Eligibility Determinations**

*Eligible Homeowners*

Eligible Homeowners for the California Mortgage Relief Program must meet the following criteria:

- Homeowner must currently own and occupy the property in California as their primary residence.

- Homeowner must not own and occupy more than one property.

- Homeowner must meet the Income Eligibility Requirements (defined below)

- Homeowner must attest that they experienced a Qualified Financial Hardship after January 21, 2020.  The attestation must describe the nature of the financial hardship.

- The original, unpaid principal balance of the homeowner's first mortgage loan, at the time of origination, cannot be greater than the "conforming loan limit" (as determined under the provisions of the Housing and Economic Recovery Act of 2008) in effect at time of origination.

Co-owners are not permitted to separately apply for Program assistance. Receiving other forms of governmental assistance, including other forms of COVID-19 assistance from the CARES Act,

Consolidated Appropriations Act of 2021 or the American Rescue Plan Act, does not disqualify a household from the California Mortgage Relief Program.

*Qualified Financial Hardship*

Homeowners must attest that they have a Qualified Financial Hardship. A Qualified Financial Hardship is a material reduction in income or material increase in living expenses associated with the coronavirus pandemic that has created or increased the risk of mortgage delinquency, mortgage default, foreclosure or displacement for a Qualified Homeowner.

- **Reduction of Income:** Temporary or permanent loss of earned income after January 21, 2020 directly related to the coronavirus pandemic.
- **Increase in Living Expenses:** Increase in out-of-pocket household expenses after January 21, 2020 such as: medical expenses, increase in household size, or costs to reconnect utility services directly related to the coronavirus pandemic.

Homeowners must complete and sign an affidavit, which includes an attestation of Qualified Financial Hardship. CalHFA received significant stakeholder feedback regarding the need to simplify documentation requirements wherever feasible, which informed the decision to use attestation.

*Eligible Legal Ownership Structures*

Eligible Legal Ownership Structures include only natural persons (i.e., LLP, LP or LLC do not qualify), and non-incorporated/revokable Living Trusts, provided the homeowner occupies the home as their primary residence.

*Income Eligibility Requirements*

To be eligible for assistance under the California Mortgage Relief Program, all household members must have a collective income equal to or less than 100% of the Area Median Income adjusted by household size.

Household members must meet one of the three paths to qualify for assistance:

- Greater than a 40% Housing to Income ratio (mortgage payment, taxes and insurance divided by gross income)
- Less than or equal to 40% Housing to Income ratio and possess a denial of alternative workout options from the servicer, excluding short sale and deed in lieu
- Currently receiving and have proof of an Income Proxy such as Unemployment, Medi-Cal, WIC, SNAP, FDPIR, TANF, SNP, Section 8 and any other income-based county, municipality, state and or federal assistance program (Public Assistance)

CalHFA is focused on households at or below 100% of Area Median Income because those Californians are most vulnerable to losing their homes to foreclosure and have fewer options for loss mitigation or

suitable replacement housing. It will continue to monitor program utilization and homeowner need and may increase its income threshold in the future, with a focus on serving moderate income households in socially disadvantaged communities.

*Reservation for Socially Disadvantaged Populations and Underserved Communities*

A percentage of the allocated funds will be reserved for socially disadvantaged and underserved communities. The amount reserved will be derived using a data-driven approach including metrics such as the U.S. Census Data, Owner Vulnerability Index (UCLA) and Qualified Census Tract (HUD), FHA, USDA, and VA Home Loan Information.

## Property Eligibility Criteria

*Eligible properties:*

- Single-family (attached or detached) properties
- One-unit owner-occupied
- Condominium units
- Manufactured homes permanently affixed to real property and taxed as real estate

*Ineligible properties:*

- Vacant or abandoned
- Second homes
- Investment property
- Chattel – Manufactured homes not affixed to permanent foundations

Manufactured homes with lot rent arrears can receive assistance through California's Emergency Rental Assistance (ERA) program. While ERA will provide significant relief to mobile homeowners, CalHFA, in consultation with its state and federal partners, will further analyze the need in this space and what policy responses would be most effective.

## Eligible Uses of Program Proceeds

Mortgage obligations as listed below are Eligible Uses of Program Proceeds:

- Existing first mortgage loan payment (principal, interest, taxes and insurance), plus any escrow shortages to fully reinstate the mortgage to a "current" status
  - » For loans with no impound accounts and delinquent property taxes, borrowers must establish an impound account with their servicer to allow for delinquent property taxes to be paid
  - » Must be at least two payments past due at time of application for assistance
  - » Delinquency must occur prior to the Program's launch date

**Ineligible Uses of Program Proceeds**

- A loan that has already been approved for a partial claim or modification is not eligible

**Assistance Disbursement Details**

Mortgage Assistance under the Program is paid out according to these guidelines:

- Assistance will be structured as a non-recourse grant.

- Maximum assistance per household is $80,000.

- CalHFA will disburse assistance directly to mortgage servicer.

- CalHFA will make no more than one disbursement to each participant in the Program.

- CalHFA will disburse the amount quoted by the servicer; any discrepancies to be resolved by the homeowner and servicer.

CalHFA reserves the right to change from a first come, first served disbursement model to a prioritized disbursement model to ensure assistance is disbursed in a manner that is consistent with the Program's focus on equity.

**Program Duration**

The period of performance for the HAF funds begins on the date hereof and ends on September 30, 2026. HAF recipient shall not incur any obligations to be paid with the funding from this award after such period of performance ends.

CalHFA plans to disburse all funds by September 30, 2025.

**Program Application Process**

Applications will be accepted online through the Outreach Navigator and Intake Review (ONAIR) Portal. All applications will be entered into the online portal and reviewed on the reviewer portal. A network of local partners as well as a call center will be available to assist homeowners through the application process, including in-language support and connecting applicants to internet services.

**Required Application Documents**

In response to public feedback about the need for a streamlined application process, efforts will be made to avoid barriers to equitable access and allow for flexibility, particularly with regard to documentation requirements.

Required application documents include, but may not be limited to, the following:

- California Mortgage Relief Program application

- Affidavit which includes an attestation of the Qualified Financial Hardship

- Third Party Authorization (TPA) and Disclosure Form

- Mortgage Statement for first mortgage

- Valid California identification and Social Security Number

- Income documentation: W2's, paystubs, previous years' tax returns or alternative income documents as applicable such as proof of an Income Proxy such as Unemployment, Medi-Cal, WIC, SNAP, FDPIR, TANF, SNP, Section 8 and any other income-based county, municipality, state and or federal assistance program (Public Assistance)

*Additional Documentation Requirements in Certain Cases*

In certain cases, CalHFA will require additional documentation to ensure that assistance is focused on Californians most in need and is delivered efficiently.

- Homeowners that have a Housing to Income ratio of less than or equal to 40%, and are not on public assistance, will need to provide a denial of alternative workout from their servicer

  » This additional requirement is needed to ensure that Program assistance is focused on the most vulnerable households that do not have other loss mitigation options. This is in accordance with U.S. Treasury guidance that directs states to "avoid using assistance in a manner that replaces other loss mitigation resources that otherwise would be available."

- Homeowners who have previously filed for bankruptcy, but who are no longer in active bankruptcy must provide proof of a court ordered "discharge" or "dismissal"

- Homeowners in active bankruptcy will need to provide written substantiation from both their loan servicer and the Bankruptcy Trustee that the homeowner(s) may receive mortgage assistance funds and said funds shall be applied to any first lien loan arrearage on their primary residence

  » This additional documentation requirement allows CalHFA a more efficient path to reinstatement for those homeowners by ensuring that the mortgage servicer and bankruptcy trustee will accept the assistance funds

## 2.4. Best Practices and Coordination with Other HAF Participants

CalHFA is collaborating with a group of western states including Oregon, Washington, Idaho, Texas, Colorado, New Mexico and Arizona. CalHFA is also exchanging program development and operational ideas directly with states nationwide. Engagement at the national level includes attendance at NCSHA National Council of State Housing Agencies meetings with administration officials, industry and consumer groups, as well as meetings with the Housing Policy Council regarding COVID Response HAF.

## 3.  Homeowners' Needs and Engagement

To assess the needs of California homeowners, CalHFA will use a sophisticated, data-driven central Geographic Information System (GIS) platform called CORD (Community Outreach Rapid Deployment), to identify those who are potentially eligible to participate in the Program. Examining the size and scope of the target population will inform the development of the Program. The Program team will then prioritize outreach and engagement efforts using the CORD platform to ensure income-qualified, socially disadvantaged individuals are made aware of financial resources, know how to apply, and are motivated to take action. Through layering mortgage, census and other key data sources, the platform will reach the target population at a granular level.

The Program therefore intends to implement a highly targeted outreach and engagement program that will:

- Prioritize engagement of socially disadvantaged homeowners who meet the eligibility criteria using detailed data to identify the target population and inform strategies and tactics that most effectively engage the audience.
- Ensure HAF funds are disbursed to the eligible population by focusing on targeted message delivery.
- Assess and adjust the outreach and engagement targeting in real time through monitoring incoming application and participation data through the CORD tool, which works together with the intake system.
- Analyze efficacy in meeting program goals.

California leads the nation in terms of diversity in race, ethnicity, language and socioeconomic conditions. The demographics of those eligible for the Program represent a wide range of characteristics.

In order to most effectively reach and activate eligible populations, the Program's outreach and engagement efforts will focus on:

- Developing and implementing marketing strategies and messaging that prompt struggling homeowners to take action and seek assistance
- Partnering with local nonprofits that reflect and serve socially disadvantaged communities to engage the targeted population
- Launching a targeted paid and earned media strategy to communicate directly with the eligible population
- Creating authentic in-language educational materials to drive eligible homeowners with limited English proficiency to take action to participate in the Program
- Developing, deploying and managing CORD, a one-stop portal with targeting data, marketing material, reporting templates and dashboards

**IDENTIFY**
Use CORD's data-driven platform to identify eligible populations, serve as a clearinghouse and offer resources and reporting for partners.

**ACT**
Drive eligible populations to take action and apply for HAF funds through compelling messaging and effective targeting.

**REACH**
Identify and communicate directly with target population through data mapping.

**SECURE**
Monitor real-time data to ensure eligible populations are informed and actively applying for the Program.

### 3.1.  Data-Driven Assessment of Homeowners' Needs

Understanding the hardships California's distressed homeowners faced and continue to face during the coronavirus pandemic is crucial to identifying the key needs that will guide the plan and funding of the Program. CalHFA is focused on ensuring that the Program meets the performance outcomes outlined by the U.S. Treasury's HAF guidance, including preventing mortgage delinquencies, defaults, foreclosures, and displacements of homeowners experiencing financial hardship. In order to do this, CalHFA examined key data sets and indicators to determine the potential size and scope of the populations that meet the threshold financial qualifications for the Program. Analysis of these data sets informed both the parameters of the relief program and the outreach and marketing plans described in detail below.

In order to design a program that effectively targets eligible homeowners with the proper assistance, CalHFA is leveraging information and data from a variety of verifiable sources. CalHFA is analyzing homeowner data about financial hardships – such as mortgage delinquencies, defaults, foreclosures, and post-foreclosure evictions – and other hardship indicators, including trends over time disaggregated by demographic categories and geographic areas that reveal social disadvantage. Our approach is to use the data analyzed within the CORD system in conjunction with information that has been collected through ongoing community engagement and public participation efforts.

CalHFA's Data-Driven Assessment of Homeowner Needs is divided into two primary categories: predictive data and actual data.

*Predictive Data*

CalHFA is defining predictive data as data that assists with the identification and estimation of eligibility, need and potential demand for assistance. CalHFA will identify, load, and consolidate data relevant to the program into CORD.

Predictive data includes, but is not limited to, the sources listed below in Table 1:

**Table 1**

| Data Set | Description | Category |
|---|---|---|
| First American Data Tree | Detailed geographical data for single-family homes in California | Mortgage Data |
| Census Table B19101 (A-1 series) | Family income by race/ethnicity at the county level | Household Income/ Demographic |
| Census Table DP03 | Detailed income level and other economic data at Census Tract level | Household Income |
| Census Table DP05 | Demographic information at the ZIP/Census Tract Level | Demographics |
| Census Table B25098 | Mortgage holder income, county level | Mortgage Data |
| FRB-Atlanta Delinquency Data | Delinquency data by county from Federal Reserve Bank of Atlanta | Mortgage Delinquencies |
| HUD Income Limits | HUD-calculated Area Median Income (AMI), very close to county level | Household Income |
| NMDB Delinquency Data | National Mortgage Database mortgage performance data given by state by quarter | Mortgage Delinquencies |
| US BLS: Labor Force Statistics | The unemployment rate (%) for a county, with historic data for trends | Workforce |
| Owner Vulnerability Index (OVI) by UCLA | An index developed by UCLA that identifies areas that are most likely to contain at-risk homeowners | Household Income/ Mortgage Delinquencies |

*Federal Reserve Bank of Atlanta Citation: Atlanta Fed calculations using Black Knight's McDash Flash daily mortgage performance data (available with a two-day lag), U.S. Census Bureau 2017 FIPS Codes*

CalHFA will consolidate variables from the above data sets into a single iterative index that aligns with Program goals and eligibility criteria. Variables within the index will be weighted according to priority and relevance to the Program. Weighting will also be adjusted based on margins of error in the source data set calculations and introduced through transforming one geography to another (e.g., ZIP code data to Census Tract-level data).

The index will provide a foundational data set that will drive area prioritization, resource allocation, demand estimation and targeting and outreach efforts. Given large variances in population distribution and demographic composition within counties and ZIP codes, data in the index will be calculated down to the Census Tract geography level, which will provide the state with the clearest and most focused picture possible of homeowner needs, risk, and priority for the Program.

This index will be periodically re-calculated when certain data sets are updated – for example, when updated delinquency and workforce statistics are released.

The details for how the index has been initially calculated are provided below. In order to compute a baseline dataset for the populations targeted by the Program, we separate into two categories: those who are delinquent/in forbearance at or below 100% AMI, and those who are socially disadvantaged.

**Baseline Data for Those at or Below 100% AMI**

Data from the US Census Bureau's table "MORTGAGE STATUS BY HOUSEHOLD INCOME IN THE PAST 12 MONTHS" (Table B25098 ACS 5-year Estimates) provides an approximate number of households in each county with a mortgage and their income. According to this table, there are approximately 5,030,939 total owner-occupied mortgage holders in California.

Data from this table for Alameda County is shown below as an example:

|  | ESTIMATE | MARGIN OF ERROR |
|---|---|---|
| **TOTAL:** | 308,891 | ±2,593 |
| **WITH A MORTGAGE:** | 226,016 | ±2,557 |
| **LESS THAN $10,000** | 2,842 | ±329 |
| **$10,000 TO $24,999** | 5,962 | ±484 |
| **$25,000 TO $34,999** | 5,155 | ±456 |
| **$35,000 TO $49,999** | 8,653 | ±521 |
| **$50,000 TO $74,999** | 18,762 | ±781 |
| **$75,000 TO $99,999** | 21,794 | ±824 |
| **$100,000 TO $149,999** | 46,229 | ±1,340 |
| **$150,000 OR MORE** | 116,619 | ±1,918 |

*Table B25098 ACS 5-year Estimates for Alameda County*

With these income limits, an estimated number of households with a mortgage that are below 100% of the AMI for that county can be determined.

The data from Federal Reserve Bank of Atlanta provides the percentage of mortgages that are in forbearance in each county. Applying this percentage to the number of households below 100% AMI calculated in the previous step provides an estimate of the number of mortgages under 100% of AMI that are in forbearance.

Finally, the data from Federal Reserve Bank of Atlanta, does not consider the ratio of households in forbearance who are current. Based on analysis from Fannie-Mae's CAS dataset, 11.3% of loans in forbearance are actually current. Removing 11.3% of the number of mortgages under 100% of AMI that are in forbearance (calculated in the previous step), yields an estimated 113,000 (90% confidence interval) total households in California that would be eligible to apply for the Program at the 100% AMI level.

**Baseline Data for the Socially Disadvantaged**

CalHFA determines this population via the following geographical areas:

1.  Qualified Census Tracts (QCT)

2.  Owner Vulnerability Index (OVI) - Areas of Highest and High Owner Vulnerability – Results via the UCLA Center for Neighborhood Knowledge, discussed below

3.  FHA, USDA, and VA Loans

QCTs host 377,500 owner-occupied mortgages – 22,400 of those are estimated in delinquency, independent of income. These census tracts are defined to be 'qualified' if 50% of households are below 60% AMI or have a poverty rate of 25% or more.  Below is the ethnic distribution in these areas:

|  | QCT Distribution | State Distribution |
|---|---|---|
| White Alone | 17.42% | 37.18% |
| Black or African American Alone | 8.66% | 5.52% |
| American Indian or Alaskan Native Alone | 0.43% | 0.36% |
| Asian Alone | 10.05% | 14.28% |
| Native Hawaiian or Other Pacific Islander Alone | 0.42% | 0.36% |
| Other Race Alone | 0.25% | 0.25% |
| Two or More Races | 2.15% | 3.03% |
| Hispanic/Latino | 60.61% | 39.02% |

The Owner Vulnerability Index is a rating system designed by the UCLA Center for Neighborhood Knowledge to assign to each ZIP code a rating to know how exposed a neighborhood may be to delinquency or worse. The index is comprised of four dimensions: burden (households paying more than 50% of income to household cost), income after housing costs, high interest rate mortgages, and foreclosure rates from 2007 – 2012. CalHFA looked specifically at the 20% of the ZIP codes rated as the most vulnerable, and found that of the 1,721,300 owner-occupied mortgages in those areas, approximately 102,266 are delinquent. We also saw a predominantly higher Black and Latino population in those highest vulnerability ZIP codes, which is represented in the chart below.

|  | OVI Distribution | State Distribution |
|---|---|---|
| White Alone | 23.41% | 37.18% |
| Black or African American Alone | 7.84% | 5.52% |
| American Indian or Alaskan Native Alone | 0.37% | 0.36% |
| Asian Alone | 8.79% | 14.28% |
| Native Hawaiian or Other Pacific Islander Alone | 0.38% | 0.36% |
| Other Race Alone | 0.23% | 0.25% |
| Two or More Races | 2.22% | 3.03% |
| Hispanic/Latino | 56.77% | 39.02% |

CalHFA will consolidate variables from the above data sets into a single iterative index that aligns with Program goals and eligibility criteria. Variables within the index will be weighted according to priority and relevance to the Program. Weighting will also be adjusted based on margins of error in the source data set calculations and introduced through transforming one geography to another (e.g., ZIP code data to Census Tract-level data).

*Actual Data*

CalHFA will continuously monitor Program performance through measuring actual data and will use this data to refine and improve the index and other predictive tools wherever possible. For example, once sufficient data has been obtained regarding Program application hot spots and gaps, correlation coefficients and other statistical means can be used to assess the accuracy of CalHFA's predictive data, which can then be adjusted and improved where necessary.

Further, CalHFA will closely monitor actuals to identify any emerging trends that may require re-allocation of resources – for example, a spike in pre-foreclosures or delinquencies in a particular area may require specific targeting. Actual data includes, but is not limited to, the sources listed below in Table 2:

**Table 2**

| Data Set | Description | Category |
|---|---|---|
| Pre-foreclosure, foreclosure, and delinquency data | Based on public FRB-Atlanta data, Notices of Default, and other court records, including from pay-to-use datasets, and will be updated regularly. This data will be combined with Census Tract income information to determine potential eligibility for the program and if readjusted outreach efforts are required following a spike or increased trend in certain areas. | Mortgage Delinquencies |
| Eligibility Pre-screener / Navigator Inquiries | Distinct sessions from the Eligibility Pre-screener, geo-coded to at least the user's ZIP code, will provide a measurable indication of demand and engagement. | Program Need/ Risk/Demand |
| Application / Case Status | Geo-locations of applications/cases based on their status (e.g., funded, pending, more information needed) will provide a measurable indication of demand, engagement, hot spots, and gaps that may require readjustment of outreach targeting efforts and methods. | Program Need/ Risk/Demand |
| UI Exhausted Claims by County | The number of exhausted UI for the county by month | Program Need/ Risk/Demand |
| US BLS: Labor Force Statistics | The Unemployment rate (%) for a county, with historic data for trends | Program Need/ Risk/Demand |

The CORD platform is flexible to rapidly transform and load additional data sets if required and as conditions change, due to wildfires, local states of emergency, or any disaster areas declaration. The CORD platform provides CBOs with the ability to view these data sets and the option to cancel or edit their reports as needed. CORD allows for data to be layered and visualized to identify greatest areas of need across multiple metrics. Additionally, CBOs are granted access to onboarding and training material, as well as a help desk to assist in their use of the CORD platform. Lastly, the CORD platform has the ability to leverage submitted applications by comparing them with the predictive data to ensure efficacy of these methods.

A key function of several "actuals" data sources in the table above, particularly the workforce data, is to assist the state in predicting whether or not potentially eligible households (based on income and AMI) are likely to financially struggle to pay their mortgages and are at higher risk of defaulting. As mentioned above, CalHFA's index will be re-calculated on a regular basis and when needed. It will serve as both a fixed and historical data point and will allow CalHFA to rapidly assess changes in potential risk and demand.

For example, if new workforce data is released that shows a large spike in UI claims in a county (perhaps following the closure of a major business), CalHFA will recalculate the index and re-assess targeting efforts when necessary.

### 3.2. Public Participation and Community Engagement

During the development of the Program, CalHFA sought feedback from the public and conducted extensive outreach to other state governmental partners, state legislative staff, and staff of the California Congressional delegation, as well as other key stakeholders in the public, private and nonprofit sectors. In order to fully assess the needs of struggling populations, it was especially important to hear directly from distressed homeowners, advocates, housing counselors, state and local leaders, the tribal community and other stakeholders.

To receive as much feedback as possible, CalHFA provided several ways for the public to participate. On June 9, 2021, CalHFA posted a public notice that provided three ways to submit comments  on its website and sent invitations to participate to over 3,300 organizations and individuals who represent homeowners or the servicing industry, including counseling agencies and intermediaries, housing and legal advocacy groups, mortgage servicers and local government groups:

 **Virtual Listening Sessions:**  CalHFA hosted three virtual listening sessions that were open to the public, including one session that sought feedback from Tribal leaders and communities. Over the course of the three sessions, 213 individuals participated and CalHFA fielded 57 comments and questions.

 **Email Submission:** The public was also given the opportunity to provide comment through email submission. CalHFA received 13 written reports/proposals with recommendations through the online submission process. The email address will remain active and open, allowing the public to provide further feedback as the Program develops.

 **Survey:** Interested parties were also invited to complete a nine-question survey developed by CalHFA that sought feedback on topics such as reaching California's most vulnerable homeowners, operational concerns and the prioritization of socially disadvantaged populations. CalHFA received 93 responses through the survey.

As stated throughout this Proposal, feedback that CalHFA received from California homeowners and stakeholders has informed and justified key elements of the Program and will continue to inform any adjustments that are made.

For example, regarding other types of assistance such as past due property taxes, insurance, HOA fees and other homeowner expenses, including those associated with reverse mortgage holders, CalHFA is assessing the feasibility and comparative need to provide that assistance should there be funds available.  As noted above, California homeowners and stakeholders are free to continue offering comments through email submission. Please see Appendix B for public feedback analysis.

### 3.3. Methods for Targeting Program Outreach/Marketing

In order to ensure that the Program meets the performance outcomes identified in U.S. Treasury guidance, and assists the California homeowners more in need, CalHFA will use various tools to target its outreach and marketing to (1) homeowners having incomes equal to or less than 100% of AMI, and (2) socially disadvantaged individuals.

CalHFA will conduct the following steps:

1. Identifying appropriate data sources (listed in Table 1 in Section 3.1) that represent factors relevant to the Program at the lowest possible geography available (e.g., Census Tract).

2. Transforming and loading these data sources into CORD.

3. Consolidating and analyzing these data sources to identify estimated eligible population counts and their locations, relative vulnerability, and overall need for targeting and resource allocation purposes.

4. Using demographic information and other Census data (such as language, race, and ethnicity) to understand key characteristics of priority areas to conduct tailored, effective outreach.



5. Leveraging federal verification hubs to gather income information as an income proxy to identify low-income borrowers to more effectively target program eligibility. This provides greater flexibility than borrower-submitted documentation.

6. Using CORD to monitor the Program and to regularly assess performance and effectiveness, such as hot spots and gaps in Program applications and actual rates and trends of delinquencies and adjusting and improving outreach targeting efforts where necessary.

**Figure 1,** screenshot from a CORD platform planning dashboard showing Census Tracts with a median income below 100% of the AMI in red on the map, as well as sample data that identifies housing in pre-foreclosure (orange house icon within a black circle).

Funding for outreach efforts will be allocated by region and adjusted based on estimated numbers of families that meet Program criteria. CalHFA will then develop regional targeting strategies based on demographic data that describes the composition of the families within the priority areas identified. For instance, partnering with Community Based Organizations (CBOs) within that region and using methods which align with and will be most effective at reaching the demographic composition of priority areas within that region.



The methods of the state's targeting and outreach activities performed in these priority areas will also be driven by data. This approach is summarized graphically in the Venn Diagram and includes a non-exhaustive list of example data sets.

## 3.4.  Marketing Plan

The need for mortgage assistance and housing counseling resources in a state the size of California exceeds the sizable funding allocation from the federal government. While it is important to make certain the eligible population is aware of this new resource and applies for support, employing a data-driven, surgical approach to marketing ensures the messages are delivered to the target population, helping to manage expectations about available resources and eligibility among California homeowners who may be ineligible. Using the CORD technology to identify the target population at a granular level allows for an efficient use of government funds by concentrating spending on the target population. It will also provide important geographic, cultural and income insights that will inform message development, which mediums will most effectively reach the target population and where to concentrate outreach strategies.

CORD will also provide valuable real-time applicant data that will be monitored throughout the implementation period. Using this data will allow the Program to adjust marketing and outreach tactics and strategies to better identify, reach, and activate targeted populations and potential applicants.

Marketing methods and strategies include:

- **Strategic Plan:** CalHFA will develop a strategic plan that uses the data to determine appropriate tactics and methods to effectively reach the target populations, deploys local organizations and other trusted messengers as valuable resources for potential applicants, and motivates eligible homeowners to apply for and receive HAF funding

and counseling assistance.  This will also include an audit of similar state outreach programs to assess best practices and lessons learned. Programs like Keep Your Home California, which administered assistance programs to homeowners following the 2008 Financial Crisis, and Housing is Key, a comprehensive state housing assistance campaign headlined by the state's COVID-19 rent relief program, will be assessed.

- **Message Development:** CalHFA will develop key messages for target audiences by incorporating feedback from public comments and leveraging CORD data and analysis. Messages will be aimed at informing the targeted populations about the Program and motivating potential applicants to act and complete their applications.

- **Graphic Design, Branding, Logo:** Design elements such as branding and a program logo will be consistent with CalHFA standards and will appear on all marketing and communications materials distributed from the agency.

- **Informational Materials and Digital Content Creation:** Key messages will anchor informational materials, including fliers, FAQs, content for website and social media. In response to stakeholder feedback that stressed the importance reaching non-English speaking communities and providing in-language support, materials and content will be translated into five languages other than English, and assessed for cultural competency in order to effectively reach targeted populations. Leveraging lessons learned from California's other housing assistance programs, CalHFA will initially translate content into Spanish, Chinese, Vietnamese, Korean and Tagalog. Visual content, such as graphics and videos, will be created for users to share across social media platforms.

- **State Integration:** CalHFA will work with other state and local agencies that serve the target population to help deliver the Program's messaging. The Program can leverage the websites and social media platforms of agencies such as the Business, Consumer Services and Housing Agency, the Department of Housing and Community Development (HCD), the Department of Fair Employment and Housing, the Employment Development Department (EDD) and even other programs like Covered California to deliver information about the Program and amplify key messages.

- **Earned Media & Public Relations:** CalHFA will engage mainstream and ethnic media to cover the availability of the Program by holding news conferences, issuing news releases and crafting op-eds. Sample media materials will also be provided to local partners. Outreach to ethnic media will be critical in expanding marketing reach and resources, especially to targeted populations whose primary language is not English.

- **Paid Advertising:** Targeted marketing efforts will involve paid placements such as print and/or radio ads, as well as digital ads (may include display, social media, native, search engine and/or video ads). Feedback from stakeholders and homeowners identified digital ads and social media as two of the best ways to reach underserved communities, in addition to working with nonprofits and community-based organizations.

- **Partner Outreach:** During the public comment period, stakeholders strongly encouraged CalHFA to partner with community-based organizations to ensure that the underserved populations receive accurate and timely information about the Program and support during the application process. In response to public feedback, the Program will engage traditional housing partners, as well as cultural, faith-based, and other community-based organizations to develop and amplify relevant key messages that will reach the targeted population. These groups will serve as trusted messengers within their respective communities who can activate potential applicants.

- **Success Stories:** The agency will work with local organizations to identify homeowners who received assistance and share their stories. Their stories can be recorded as written or visual testimonials, and the content will be shared across all program platforms. Since feedback from California homeowners and stakeholders listed news reports among the top ways to reach underserved communities, CalHFA believes that pitching success stories is an effective way of engaging with news organizations.

- **Reporting Narrative:** The agency will provide regular reports throughout the lifespan of the project, as well as a detailed analysis and key lessons learned after program completion. These regular reports, which will include a public-facing dashboard with real-time data, will help CalHFA and key stakeholders track the Program's progress and will be especially useful in ensuring that target populations are reached.

### 3.5. Inclusion of Local Governments, Nonprofits and Counseling Agencies

CalHFA will work closely with local governments, nonprofit organizations, and housing counseling agencies as it develops and begins to administer the Program.

Cooperation with local governments, nonprofits, and counseling agencies is crucial, not only in helping to inform and educate potential applicants, but also in reducing barriers of participation for those eligible to receive assistance. CalHFA received feedback that community-based organizations should serve as trusted messengers during the application process. CalHFA will work with a local partner network that is geographically and linguistically diverse and can encourage and support potential applicants through the application process. This may include helping with online access.

In addition to receiving feedback during the public comment period, particularly from nonprofit organizations and housing counseling agencies, CalHFA has actively engaged with these groups to gain valuable insight and guidance during the Program development.

Coordinating with these groups, who have an invaluable front-line perspective, will be equally important throughout the outreach and implementation of the Program.

## 4.  Performance Goals — Measuring and Reporting

### Reports

Measuring performance outcomes will be critical in determining the impact that the Program has on the pandemic-related economic crisis affecting California homeowners. CalHFA will develop a variety of performance-based reports to manage and monitor the Program, which will comply with all requirements listed in the U.S. Treasury HAF guidance. Overall Program progress will be measured by the total number of homeowners assisted and success will be measured by the number of foreclosures prevented and the number of homeowners who were assisted in reducing their mortgage delinquency among the targeted populations.

CalHFA will provide the U.S. Treasury all required reports including: 1) demographic information on all borrowers; 2) status and final outcomes of borrowers served; 3) quarterly progress reports; and 4) additional reports as requested. Some of the detail that will be contained in the Program reports is expected to include, but not be limited to, the following summary and detailed data.

By owner and co-owner(s)

- Income
- Home Mortgage Disclosure Act: race/ethnicity/sex
- Loan-to-Value (LTV), Combined Loan-to-Value (CLTV), Housing to Income (HTI)
- Location: Qualified Census Tracks or OVI
- Program usage: Fund Disbursement Detail
- Arrearage (by dollar and number of months)
- Initial past due date
- Loan performance: post-assistance delinquency status
- Hardship: self-reported categories
- Homeownership retention (post-assistance outcome within 2 years of assistance):
    » Negative outcome: foreclosure sale, deed in lieu, short sale
    » Positive outcome: recipient still owns home, traditional sale

By Servicer

- Program participation rate, quantity and percentage of servicers participating
- Number of homeowners and total funds disbursed for each servicer
- Program performance: approval, denial & withdrawn rates
- Loan performance: post-assistance delinquency status

- Loan-to-Value (LTV), Combined Loan-to-Value (CLTV), Housing to Income (HTI)
- Average arrearage (by dollar and number of months)
- Average borrower income
- Average assistance

By Program

- Program participation rate, and quantity participating by program
- Number of homeowners assisted and total funds disbursed by program
- Program performance: approval, denial & withdrawn rates
- Loan performance: post-assistance delinquency status
- Loan-to-Value (LTV), Combined Loan-to-Value (CLTV), Housing to Income (HTI)
- Average arrearage (by dollar and number of months)
- Average borrower income
- Average assistance

**Process Goals**

| 1 | Reducing Mortgage Delinquency Among Targeted Populations |
|---|---|
| 2 | Meaningful Homeownership Retention |
| 3 | Average Application Processing Time, From Initial Application Submission Through Disbursement of Funds<br>• 60 days or less |
| 4 | Effectiveness At Serving Socially Disadvantaged Homeowners<br>• Greater than 40% |
| 5 | Program Timeliness<br>• California Mortgage Relief Program: disburse 50% of allocated funds by 12/31/2022 |

| Program Design Element | Metrics of Success | Goal |
|---|---|---|
| Mortgage Reinstatement | • Mortgage Relief Program: disburse 50% of allocated funds by 12/31/2022<br><br>Average application processing time, from initial inquiry through disbursement of funds less than 60 days. | • Disburse allocated HAF funds quickly from initial inquiry through disbursement of funds to reduce mortgage delinquency among targeted populations. |
| | • Deliver help to 20,000 households in need from communities at/below 100% AMI.<br><br>• Help these 20,000 homeowners by fully reinstating previously delinquent mortgage loans. | • Assist targeted percentage of households from communities at/below 100% AMI.<br><br>• Assist targeted communities with Homeownership retention |

## 5. Readiness

CalHFA was created in 1975 for the sole purpose of providing low cost financing for both rental and ownership housing.  CalHFA is a quasi-independent agency that is governed by a board of directors consisting of appointed and ex-officio members. CalHFA was chartered as the state's affordable housing lender and continues to serve that purpose by providing financing for low- and moderate-income Californians. The Agency's Multifamily Programs Division finances affordable rental housing through partnerships with jurisdictions, developers, local, state and federal government partners and more, while its Single-Family Programs Division finances first mortgage loans and down payment/closing cost assistance to first-time homebuyers. CalHFA's operations are funded by revenues generated through its mortgage loan programs, not taxpayer dollars, although some of its program funding comes from California's General Fund and voter-approved initiatives. Over the course of its existence, CalHFA has helped more than 201,000 Californians purchase their first home with a mortgage they can afford; helped finance the development and preservation of more than 70,000 affordable homes and apartments for veterans, seniors, those with special needs, and families in danger of experiencing homelessness; and distributed $2.2 billion to help more than 90,000 Californians avoid foreclosure by administering the Keep Your Home California program from 2011 to 2018. Additional information on CalHFA's homeownership programs, along with a database of participating lenders, can be found on CalHFA's website at  www.calhfa.ca.gov.

CalHFA also has extensive experience administering state bond-funded programs including, but not limited to, the California Housing Downpayment Assistance Program in the amount of approximately $320 million; the Extra Credit Teacher Program, in the amount of approximately $25 million; the School

Facility Fee Program, in the amount of approximately $50 million; the Residential Development Loan Program, in the amount of approximately $50 million; and the housing loan development component of the California Mental Health Services Act, in the amount of $400 million.

In May 2009, CalHFA introduced the CalHFA Loan Modification Program (CMP), a simple, streamlined loss mitigation tool aimed at helping families in the CalHFA single-family loan portfolio retain their homes. To date, this program has received more than 3,257 applications and approved 2,099 for final modification.

Following the housing crisis that began in 2007, 18 states, including California, were designated as "hardest hit," either because their unemployment rates were at or above the national average or they saw steep home price declines since the housing market downturn. In February 2010, the federal government created the Hardest Hit Fund to provide targeted aid to families in these states. On June 23, 2010, California received approval to administer Hardest Hit funds through CalHFA for foreclosure prevention. To receive these funds, CalHFA created the CalHFA Mortgage Assistance Corporation (CalHFA MAC), a nonprofit public benefit corporation, to administer the state's HHF program. California was ultimately awarded $2.36 billion in funds to help eligible California homeowners avoid preventable foreclosures.

CalHFA MAC launched the Keep Your Home California (KYHC) program, which offered five unique ways to provide financial relief to homeowners and help them remain in their home.

- The Unemployment Mortgage Assistance Program provided monthly payment assistance to eligible homeowners whose hardships were unemployment or underemployment.

- The Mortgage Reinstatement Assistance Program helped reinstate the past due mortgages of homeowners who recovered from an eligible hardship such as loss of income, death, disability, divorce or unemployment/underemployment.

- The Principal Reduction Program assisted homeowners whose principal residence was "underwater" due to severe negative equity.

- The Transition Assistance Program acknowledged that some homeowners with a permanent, unresolvable hardship, needed assistance with safely transitioning from their homes when a short sale or deed-in-lieu of foreclosure was negotiated with their servicer.

- The Reverse Mortgage Assistance Pilot Program helped prevent foreclosure by reinstating past due property-related expenses and provide an additional financial cushion to cover required property-related expenses for up to 12 months in the future.

In total, the KYHC program assisted 93,696 Californians and distributed $2.2 billion in mortgage relief.

This innovative and inclusive program was a great success, highlighted by a 98% rate of foreclosure prevention through the Unemployment, Mortgage Reinstatement, Principal Reduction and Reverse Mortgage programs.

## 5.2. Project Procurement & Management

CalHFA employs a comprehensive project management approach to the development of programs that involves subject matter experts from within CalHFA, complemented, as necessary, by outside expertise, detailed project tracking to ensure timely delivery of programs, and management involvement that coordinates necessary resources and determines priorities. Our depth of management experience will add significant value to the Program and ensure proper development, implementation, quality, compliance, controls and adherence to policies and procedures. We appreciate the opportunity to have our experienced team work with the U.S. Treasury to design and implement scalable, innovative approaches to foreclosure prevention that meet the needs of California's most vulnerable and socially disadvantaged homeowners. We are confident that our program will complement other federal and private-industry programs and activities designed to stabilize California's housing market.

Within CalHFA, staff has been dedicated to providing outreach and training to borrowers, lenders and local governments to ensure a complete understanding of our programs. This outreach effort is coupled with our in-house marketing division that provides the necessary materials and media connections to promote programs. CalHFA intends to leverage its current systems and protocols in fulfilling the compliance and monitoring requirements that come with receiving the monies from the Homeowner Assistance Fund.

## 5.3. Corporate Governance and Systems

### Corporate Governance

Governance refers to the policies, procedures, principles and practices effectuated by management and staff, and designed to provide strategic direction and tactical guidance that ensure programmatic goals and objectives are achieved, risks are identified and managed appropriately, and resources are assigned responsibly. Through CalHFA, the CalHFA Homeowner Relief Corporation, a California nonprofit public benefit corporation ("CalHRC"), will establish a corporate governance structure built upon a foundation of policies, procedures, principles and practices, to govern and operate the Program with transparency, accountability, integrity and security.

### Board of Directors

A board of directors appointed by CalHFA's executive director and vested with the authority to manage the nonprofit's business and affairs will be CalHRC's governing body. The board will be comprised of no fewer than five members, all of whom will be seasoned executives with a breadth of relevant operational and industry experience. They will implement transparency, accountability and ethics throughout the

organization and lead the overall direction and strategy of CalHRC. Day-to-day execution of the operation will be delegated by the board to the executive management and operation team staff, all of which are CalHFA employees.

### Policies & Procedures

Policies and procedures will be foundational to CalHRC's corporate governance and, as such, will be sponsored from the top down, approved by executive leadership, and documented and implemented at the executive, managerial and staff levels with responsibility and accountability for compliance held at each level. They will serve as the roadmap for day-to-day operations, define employee responsibilities and provide guidance on decision-making throughout all operational aspects of the Program. Extensive training and the adoption of a conflicts of interest policy for all directors, officers and employees of CalHRC will augment the established policies and procedures, to further reinforce adherence and ensure a more streamlined, effective and efficient operation.

### Technology & System Infrastructure

CalHFA will leverage a commercial, secure, cloud-based client management system to ensure effective program delivery, compliance, and reporting, in a manner that will meet the Program requirements and guidance from U.S. Treasury. For outreach management, CalHFA has identified and will use a Community Outreach Rapid Deployment System to implement a data-driven assessment solution to provide outreach planning and targeting. It also provides data reporting to document outreach efforts and success metrics.

For guided pathways, CalHFA will use an eligibility triage software platform, Navigator, to direct applicants to the proper program that best serves their eligibility criteria. For client intake and reporting management, CalHFA will use OnAir for applicant service management for inquiry, enrollment, application tracking, notifications, determinations, eligibility, disbursements, reporting and as a system of record for audit purposes for Program applicants.  The system is also cloud-based, mobile friendly and accessible, and provides language support.

CalHFA is planning to update and leverage its existing channels and connectors for the data exchange with lenders/servicers, leveraging secure data exchange, such as SFTP sites and secure email.  In order to ensure performance goals and metrics are managed, the complete system data access model is integrated from a reporting perspective and provides detailed information that will enable CalHFA to provide all necessary reporting requirements.

### Internal Controls & Quality Assurance

Internal controls will be developed around program risks identified in areas such as strategy, operations, finance, information security, fraud, systems and compliance. The internal control program will be designed to minimize the aforementioned risks, mitigate conflicts of interest, maximize operational efficiency and ensure effectiveness of program administration. Internal controls will be developed by the

operational vendor, reviewed by management and the quality assurance vendor, and tested throughout the life of the Program.

The independent quality assurance vendor will also develop a quality assurance program to assess and continually improve program administration and services rendered by the operations vendor. The quality assurance program serves as means to measure, report and identify improvement opportunities with respect to adherence with policies, procedures, productivity, guidelines and quality standards set by management.

### 5.4. Staffing, Contracts and Partnerships

#### Experienced Staff

CalHFA's current programs are overseen and administered by a highly experienced team of middle- and senior-level managers. Collectively, CalHFA senior officers have over 175 years of experience in the mortgage industry and in single-family low-to-moderate income housing programs.  CalHFA as a whole has developed extensive experience over the course of its 45-year existence in the creation, implementation and management of new programs.

It is expected that an initial wave of homeowners will apply through the online application portal to take advantage of the Program followed by monthly inflows of applicants as homeowners experience financial hardships, newly default on their mortgages, and/or learn about the Program through the outreach and marketing campaign.  This will place an immediate demand on current CalHFA and servicer staff once the Program is made available.

As mentioned above, CalHFA has created a California nonprofit public benefit corporation, CalHRC, to administer the HAF funds on behalf of CalHFA, the named agency by the state of California as an "eligible entity" under ARPA.  The intent of this structure is to keep federal funds separate and apart from CalHFA's own balance sheet.  In addition, this structure allows for greater nimbleness with which to deploy HAF funds as quickly as possible to struggling California homeowners.  This structure is formally arranged by an administrative services agreement between CalHFA and CalHRC, providing for the reimbursement of CalHFA resources and staff time to set up, manage and operate the Program, as well as identify roles and responsibilities with respect to the disbursement of HAF funds to Program participants.

The staffing plan detailed below is based on CalHFA's Proposal for the Program and the efforts needed to develop, implement and support the Program for the expected duration.  Due to the timeline for proposal development, the comprehensive operational impact is not yet fully understood. CalHFA will attempt to use its own staff to fulfill as many Program roles as possible. However, due to the urgency needed to make the Program available to eligible homeowners, and the amount of time needed to recruit and hire staff employed by the State of California, some roles may be filled by knowledgeable contractors, as necessary.  Because these Program roles are relatively short-term, hiring contract

staff may be the best, most efficient choice. CalHFA will make this staffing decision based on staff capabilities, availability, expediency and reasonableness of cost.

The following is CalHFA's best estimate of the staffing requirements for the Program, and includes estimates of the number of staff necessary during each year of the planned, three-year Program:

**Internal Staffing**

**Director of Homeownership (x1)** – The Director of Homeownership for CalHFA oversees CalHRC as its President, as well as serving on its board of directors. In addition to CalHFA staff, the position is responsible to the CalHFA Board, the CalHRC Board and the U.S. Department of the Treasury regarding overall Program direction. The President approves administrative rules and policies as they pertain to Program design and administration.  The position will be part-time through the implementation, administration and wind-down periods.

**General Counsel (x1)** – The CalHFA General Counsel oversees Program legal affairs, including serving as Secretary to the CalHRC board of directors. As an officer to both CalHFA and CalHRC, the General Counsel will create, facilitate, and retain agreements between CalHFA, CalHRC, respectively, and the Program Participants, i.e., Servicers. The Program will rely on CalHFA's General Counsel to complete all the steps required to legally bind the servicer and/or homeowner, as applicable, to carrying out their obligations under the Program. The position will be part-time through the implementation, administration and wind-down periods.

**Staff Counsel (x2)** - CalHFA Staff Counsel will assist the General Counsel in oversight to Program legal affairs. They will help in the creation, facilitation, and retainment of agreements between CalHFA, CalHRC and Program participants. Staff Counsel will also provide all general legal assistance the General Counsel may need. The positions will be part-time through the implementation, administration, and wind-down periods.

**Comptroller (x1)** – The CalHFA Comptroller serves as the Chief Financial Officer for CalHRC and will oversee the servicer setup, review of budget changes and reporting, and review of audits and quarterly financial reports. The Program will rely on the work of this staff resource to disburse authorized mortgage assistance payments to servicers on behalf of the Program, among other forms of assistance. The position will be part-time through the implementation, administration and wind-down periods.

**Fiscal Services Support Staff (x5)** - The Fiscal Services Support Staff will assist the Chief Financial Officer with accounting responsibilities, including disbursement transactions, maintaining the general ledger, expense and reimbursement payments, review of budget changes and reporting, and other accounting-related duties. The positions will be part-time through the implementation, administration and wind-down periods.

**Director of Enterprise Risk Management and Compliance (x1)** - The CalHFA Director of Enterprise Management and Compliance serves as the Vice President for CalHRC, overseeing the corporation's management and business activities, subject to the supervision and direction of the President, or in their absence, perform the duties and exercises the powers of the President.  The position will be part-time through the implementation, administration and wind-down periods.

**Enterprise Risk Management and Compliance Staff (x2)** - The Enterprise Risk Management and Compliance staff will assist the Vice President for CalHRC with managing the corporation's business activities, governance structure, risk management and related operational activities.  The positions will be part-time through the implementation, administration and wind-down periods.

**Director of Legislation and Policy (x1)** - The CalHFA Director of Legislation and Policy serves as a director to the CalHRC board. The position will be part-time through the implementation, administration and wind-down periods.

**Housing Finance Chief (x1)** - The CalHFA Housing Finance Chief will advise on Program design and best practices for disbursement of mortgage assistance funds. They will leverage their knowledge base from prior programs to help programmatically distribute funds in the most efficient and effective manner to qualifying Program participants. The position will be part-time through the implementation, administration and wind-down periods.

**Director of Marketing & Communications (x1)** - The CalHFA Director of Marketing & Communications will oversee CalHRC's direct marketing and public communication activities. The director will collaborate with the Outreach and Participation Director to develop a data-driven outreach strategy that raises Program awareness and targets eligible homeowners.  The position will be part-time through the implementation, administration and wind-down periods.

**Marketing Support Staff (x3)** - The Marketing Support Staff will support the outreach and marketing efforts with communication to community based organizations, development of Program material and collateral, demographic data sourcing and analysis, public relations and other outreach related responsibilities. The positions will be part-time through the implementation, administration and wind-down periods.

**Chief Information Officer (x1)** - The Chief Information Officer will lead and oversee the development and implementation of the Program's information technology infrastructure. Responsibilities will include vendor selection, solution design, development and implementation, contract negotiations, information security management and other information technology related activities.  The position will be part-time through the implementation, administration and wind-down periods.

**Information Technology Support Staff (x5)** - The Information Technology Support staff will consist of specialists that cover information security and exchange, application systems development and

support, infrastructure and workstation support, and information technology. They will assist the Chief Information Officer in overseeing the development and implementation of the Program's technology infrastructure. The positions will be part-time through the implementation, administration and wind-down periods.

**Director of Administration (x1)** - The Director of Administration will oversee human resources, internal labor relations, contracts and records, and other human resource related activities. The position will be part-time through the implementation and wind-down periods.

## External Staffing

CalHFA will contract with a consulting vendor, who will collaborate with CalHFA in identifying and onboarding the external staff needed to support the Program. External staff, unless otherwise noted in the position description, will be directly hired by or contracted through the consulting vendor.

**Program Directors (x2)** – The Program Directors will advise and direct the overall strategy to implement and administer the Program with respect to the objectives of CalHFA and the guidance from the U.S. Treasury. The Program Directors will ultimately be responsible for the project management of the Program and will be instrumental in evaluating and selecting crucial components of the Program such as vendors, technology solution platforms and key staff. They will also serve as Program ambassadors with key stakeholders and will be required to report Program progress and updates to senior management on a regular basis. The position will be part-time through the implementation, administration and wind-down periods.

**Senior Project Manager (x1)** – The Senior Project Manager will lead the planning and implementation of the project, which includes establishing and managing work plans, coordinating and facilitating meetings between key stakeholders, reporting progress and upcoming deadlines, identifying and addressing project risks, and any other project management activity required to stand up and administer the Program. The Senior Project Manager will also manage the day-to-day reporting of Program progress with management and key stakeholders. The position will be full-time through the implementation and administration periods, and part-time during the wind-down period.

**Project Management Analyst (x1)** – The Project Management Analyst will support the Senior Project Manager in the planning and implementation of the project. Responsibilities include establishing and managing work plans, coordinating and facilitating meetings between key stakeholders, reporting progress and upcoming deadlines, identifying and addressing project risks, and any other project management activity required to stand up and administer the Program. The Project Management Analyst will also compile the day-to-day reporting of Program progress with management and key stakeholders. The position will be full-time through the implementation and administration periods, and part-time during the wind-down period.

**Director of Operations (x1)** – The Director of Operations oversees all operational aspects of the Program and responsible for program administration. Responsibilities include leading the administration of the program, reporting of program progress to executive management, managing staff and operational vendors, and overseeing any other key operational activity as required by the Program. The position will be full-time through the implementation and administration periods, and part-time during the wind-down period.

**Operations Manager (x1)** – The Operations Manager is responsible for ensuring the execution of the day-to-day operations of the Program, which includes monitoring program vendors in the administration of application intake, processing and underwriting, call centers, Common Data File (CDF) exchange, program accounting and reporting, and any other operational activity as required by the Program. The position will be full-time through the implementation and administration periods, and part-time during the wind-down period.

**Director of Finance (x1)** – The Director of Finance will oversee the financial aspects of the Program, which includes but is not limited to budgeting, accounting, vendor contract management, audits, internal controls, and quality control and compliance programs. The position manages and supports external vendors with the development and implementation of internal controls, quality assurance and compliance programs, and other accounting related processes. The position will be full-time through the implementation and administration periods, and part-time during the wind-down period.

**Budget & Accounting Analyst (x1)** – The Budget & Accounting Analyst will support the tracking, monitoring and reporting of actuals and budget variances for the Program. The analyst will also support the day-to-day accounting and financial reporting requirements of the Program. The position will be full-time through the implementation and administration periods, and part-time during the wind-down period.

**Contract Analyst (x1)** – The Contract Analyst will handle the day-to day management and procurement of all contracts relating to the Program, which includes audit firms, servicers, loan counselors, legal firms, operational vendors, consultants, technology vendors and any other program contractors as needed. The position will be full-time through the implementation and administration periods, and part-time during the wind-down period.

**Quality Control & Audit Director (x1)** – The Quality Control & Audit Director will implement and ensure proper execution of the quality control and compliance programs, as well as manage the audit firm relationship. The position will be full-time through the implementation period, and part-time during the administration and wind-down periods.

**Quality Control Analyst (x1)** – The Quality Control Analyst will handle the day-to-day quality control of the Program to ensure adherence to program guidance and requirements. Responsibilities include conducting QC reviews, recording and tracking all QC findings, and identifying and tracking corrective actions. The position will be full-time through the implementation and administration periods, and part-time during the wind-down period.

**Compliance Analyst (x1)** – The Compliance Analyst will handle the day-to-day monitoring of the Program's compliance to ensure adherence to the Program and industry requirements, as well as federal, state and local laws and regulations. Responsibilities include conducting compliance reviews, recording and tracking all compliance findings, and identifying and tracking corrective actions.  The position will be full-time through the implementation and administration periods, and part-time during the wind-down period.

**Servicer Management Director (x1)** – The Servicer Management Director serves as a liaison between the servicers and intermediaries, and the Program. Responsibilities include servicer and intermediary outreach, managing the contracts, overseeing servicer and intermediary relationships, providing information and materials regarding program guidance, policies and processes, and overseeing any other servicer and intermediary related activity.  The position will be full-time through the implementation and administration periods, and part-time during the wind-down period.

**Servicer Lead Associate (x1)** – The Servicer Lead Associate will support the Servicer Management Director in managing the relationship between the Program and the servicers and intermediaries. The associate will help with servicer and intermediary outreach and requests, compiling information and materials regarding program guidance, policies and processes, and any other servicer and intermediary related activity.  The position will be full-time through the implementation and administration periods, and part-time during the wind-down period.

**Outreach and Participation Director (x1)** – The Outreach and Participation Director will oversee the outreach and marketing efforts of the Program. Responsibilities include designing the marketing strategy and budget, communicating with community-based organizations, managing paid advertising, public relations, and developing program collateral and material.   The position will be part-time through the implementation, administration and wind-down periods.

**Outreach Support Specialist (x1)** – The Outreach Support Specialist will assist the Outreach and Participation Director with the outreach and marketing efforts. Responsibilities include supporting the marketing strategy and budget, communication with community-based organizations, paid advertising, public relations, and development program collateral and material. The position will be full-time through the implementation and administration periods, and part-time during the wind-down period.

**Data Support Specialist (x1)** – The Data Support Specialist helps identify, compile and analyze relevant data sets that support the Program's data-driven and targeted outreach campaign. The specialist works closely with the Data Scientist and the Outreach and Program Director to define and implement a targeting methodology with CORD that is consistent with U.S. Treasury and ARPA guidance. The position will be part-time through the implementation, administration and wind-down periods.

**Data Scientist (x1)** – The Data Scientist identifies and sources relevant data sets that will drive the Program's data-driven and targeted outreach campaign. The Data Scientist works closely with the

Data Support Specialist and the Outreach & Program Director to define and implement a targeting methodology within CORD that is consistent with U.S. Treasury and ARPA guidance. The position will be part-time through the implementation, administration and wind-down periods.

**Technology Director (x1)** – The Technology Director oversees the design, development, implementation and maintenance of the technology solution platforms that facilitate Program outreach and administration. The director will also be involved with technology vendor selection, management and contract negotiations. The position will be full-time through the implementation period, and part-time during the administration and wind-down periods.

**Product Analyst (x1)** – The Product Analyst manages the day-to-day design, development, implementation and maintenance of the technology solution platforms that facilitate Program outreach and administration. The analyst will be the liaison between technology vendors and the Program, helping guide vendors in the design, development and implementation of their solution platform. The position will be full-time through the implementation and administration periods, and part-time during the wind-down period.

**Quality Assurance Developer (x1)** – The Quality Assurance Developer oversees the assurance program and testing of the Program's solution platforms. Responsibilities include establishing and developing test plans, reporting deficiencies, and identifying corrective solutions to the director and product analyst. The developer will also be the liaison between the solution platform administrative users and the technology team, escalating and resolving issues relating to the platform. The position will be full-time through the implementation and administration periods, and part-time during the wind-down period.

**Business Analyst (x2)** – The Business Analysts will validate the effectiveness of the solution platforms in meeting the business requirements of the Program. Responsibilities will include cross referencing business requirements with platform specifications and analyzing and recommending system improvements on system usability. The position will be full-time through the implementation period, and part-time during the administration and wind-down periods.

**Quality Assurance Tester (x2)** — The Quality Assurance Testers will execute test scripts designed by the Quality Assurance Developer to ensure adherence to program guidance and requirements. Responsibilities include recording test successes and failures, tracking findings, and identifying and tracking corrective actions. The position will be full-time through the implementation period, and part-time during the administration and wind-down periods.

**Operations Finance Manager (x1)** — The Operations Finance Manager will be provided by the operations vendor and responsible for the financial accounting of the Program's in compliance with state and federal laws and requirements set forth in the U.S. Treasury HFA Participation Agreement. Responsibilities include U.S. Treasury draw down coordination, wire transfer, ACH credit and deposit classification, periodic reconcilements and routine vendor payables review, GL coding and reconciliation,

and other accounting related responsibilities. The position will be full-time through the implementation and administration periods, and part-time during the wind-down period.

**Staff Accountant (x1)** — The Staff Accountant will be provided by the operations vendor and responsible for assisting the Operations Finance Manager with daily accounting operations, including draw downs, wire transfers, ACH credit and deposit classification, periodic reconcilements and routine vendor payables review, GL coding and reconciliation, and other accounting related responsibilities. The position will be full-time through the implementation and administration periods, and part-time during the wind-down period.

### Key Business Partners

**Audit Firm Vendor** – The Audit Firm Vendor will provide independent financial audits, opinion on internal controls and quality control consulting for the Program. The staffing will be full-time during the implementation and audit periods, and part-time during non-audit periods.

**Outside Legal Counsel Vendor** – The Outside Legal Vendor will support the General Counsel and Staff Counsel, as necessary, on legal issues and resolutions associated with the Program. The anticipated Outside Legal Counsel Vendor has extensive real estate, banking and bankruptcy expertise, and experience working with CalHFA. The staffing will be part-time throughout the life of the Program.

**Consulting Vendor** – The Consulting Vendor, collectively with CalHFA, will oversee and manage the design, implementation, administration and wind-down of the Program. The vendor will manage all aspects of the project, facilitate knowledge transfers, develop, maintain and organize project documents, and provide other project duties as assigned. The staffing will be full-time through the implementation and administration periods, and part-time during the wind-down period.

**Technology Solution Vendor** – The Technology Solution Vendor will provide back-end solution services to facilitate CDF transmissions with servicers and integrate the OnAir platform with CalHFA's accounting system. The technology vendor has experience working with CalHFA and will leverage prior development to implement the back-end platform solution. The staffing will be full-time through the implementation and administration periods, and part-time during the wind-down period.

**Operations Vendor** – The Operations Vendor will provide the administration services for the Program, which includes application intake, eligibility and processing, call center services, CDF exchange services and back-office accounting (including budget related duties). The vendor will have experience working with CalHFA and is familiar with CalHFA systems. The staffing will be full-time through the implementation and administration periods, and part-time during the wind-down period.

**Quality Assurance Vendor** – The Quality Assurance Vendor will review the initial set up of internal controls, and design and implement a quality assurance program that will monitor the administration of the Program. The vendor will be independent of the Operations Vendor. The staffing will be full-time through the implementation and administration periods, and part-time during the wind-down period.

## 5.5. Servicers' Engagement

CalHFA understands the importance of reaching out to and engaging mortgage servicers and mortgage servicers associations in order to leverage industry support and help ensure the Program is successful. As such, this section will demonstrate how CalHFA plans to conduct outreach and on-boarding of servicers and associations to further maintain a positive and effective working relationship with industry stakeholders through the life of the Program. The establishment of these working relationships will have the goal of benefiting the Program participants. The Servicers Engagement process first includes outreach to the mortgage servicers and interested servicer associations. Next, the engagement process describes CalHFA's efforts to foster continued servicer participation and engagement. Both steps are important to the Program's success.

### Servicers Outreach

CalHFA has already taken various preliminary steps to ensure that the servicers outreach portion of the Servicers Engagement process is best tailored for success. CalHFA has begun the process of reaching out to over 250 servicers as well as multiple servicer associations to refresh contact information and prepare for the outreach process. This process will result in garnering commitments and initial participation from the mortgage service industry. In that vein, the CalHFA has already devoted several internal staff and experienced consultants dedicated to this effort (see "Readiness"). In addition to kicking off the outreach process, these resources are focused on documenting, managing and executing on the servicer outreach strategy for the Program. Tasks they are working on include:

- Developing servicer on-boarding contact and program participation data requirements, method of data collection and data sharing.
- Defining business requirements for reports necessary to support the "on-boarding" of servicers and monitoring the performance of participating servicers.
- Communicating and addressing issues experienced by servicers during the on-boarding process of previous programs.
- Developing servicer frequently asked questions (FAQs) to be distributed or posted on the Program website.
- Coordination of and preparation for permissible information sharing with interesting, auxiliary parties (i.e. applicable Federal and State regulators, Legislators, Servicers Associations, etc.)

Furthermore, the CalHFA team has already held countless preliminary unofficial stakeholder meetings and communications with major servicer industry leaders to lay the groundwork for the ongoing outreach process.

The CalHFA has also begun to work closely and leverage past relationships with industry leaders that have participated in previous Agency programs and endeavors that are closely aligned with the goals of

the Program. This engagement will bolster confidence in the potential participating servicers and ensure that the Program will be comprehensively staffed and equipped with the necessary tools to ensure the Program participants are best served, and the HAF resources are most effectively and impactfully used.

The state has also obtained the expertise of an independent Servicer Liaison. Accompanied by CalHFA oversight, the Servicer Liaison is associated with both the servicer outreach and servicer engagement processes. The Service Liaison will be responsible for developing further, more specific outreach processes and procedures in concert with CalHFA. Related to outreach, processes and procedures that the Service Liaison will drive include, but are not limited to, drafting of the Servicer Enrollment and Participation Guidelines; finalizing initial recruitment of potential mortgage service industry participants; organizing and assuming a leadership role in telecommunications, webinars, web-based collaborative meetings, and other avenues of communication with the servicers; organizing and assuming a leadership role in on-going stakeholder engagement in order to communicate developing program goals and initiatives; as well as assist in the development of a streamlined and individualized funds and data transfer process and the associated CDF.

### Servicers Engagement

Once the mortgage industry servicers have been reached out to and are committed to working with the CalHFA, the engagement process will begin. It begins with servicer execution of the Program memorandum of understanding (MOU), and verification of the correct completion of the servicer contact sheet and funding agreement. Once the servicer has committed to being involved in the Program, timely and effective training relative to the Program policies, procedures, processes and systems will occur. The engagement process will use a variety of technologies, personnel, and resources to ensure that the servicers are fully engaged, thus providing the best assistance to the Program participants. These tools will also help ensure the most efficient and equitable use of HAF funding. CalHFA understands that while outreach to servicers is important and, indeed the beginning of the working relationship, the ongoing engagement with the servicers will be crucial to support the distribution of allocated funds in the most effective and equitable means possible.

CalHFA will also use a common data file, or CDF, that will be integral for the on-going engagement of servicers. This common data file, shared between CalHFA, select CalHFA partners, and the associated servicers will be a secure, yet transparent transmission of data and funds. The data file, at its core, is an electronic spreadsheet that will highlight key data points for approved participants and track the allocation of available funds. The tracking mechanism will serve as a metric for determining whether assistance through Program funding will be allocated to the individual applicant. This form of factual and unambiguous communication will serve to promote clarity and efficiency throughout engagement process. CalHFA has engaged the services of the contractor that successfully built and maintained the CDF for the prior CalHFA homeowner assistance program. This will help ensure that the common data file is implemented in the most effective and efficient manner.

CalHFA understands the importance of engaging early and continuously with the servicers, and for that reason has given high priority to this area of this Program.

**Housing Counselor Collaboration**

Through feedback from stakeholders and experience gained by administering the HHF program, as well as its ongoing homebuyer assistance programs, CalHFA has found that homeowners who participate in housing counseling have more successful outcomes. To that end, CalHFA is providing multiple resource avenues so that all applicants can receive housing counseling from a HUD-certified Housing Counseling Agency. This counseling, which can be obtained for free through participating agencies, not only helps homeowners navigate through various affordable long-term recovery solutions with their mortgage servicers, but also provides financial education that will help homeowners maintain a successful homeownership experience following reinstatement.

# 6. Budget

## 6.1. Operations

**Administrative Expenses**

CalHFA's intention is to allocate the HAF monies in a manner that allows the maximum amount to be spent directly on assisting eligible homeowners.  However, responsibly deploying approximately $1.055 billion to provide relief for our country's most vulnerable homeowners does not come without expense – both to ensure that the dollars are being spent appropriately and that proper reporting and oversight takes place, as required by the U.S. Treasury.

Indeed, the Program will have a variety of administrative expenses separate and apart from the actual funds going toward the affected homeowners.  These expenses include the one-time expenses of implementation and the ongoing expenses of administering the Program. The one-time expenses are associated with designing and implementing the programs and systems needed to support the Program in production and to meet the reporting and compliance requirements of the U.S. Treasury.

The estimated administrative expenses are based on CalHFA's understanding, at the time of this Proposal, of the Program and the efforts needed to implement and execute the Program throughout its anticipated duration. CalHFA leveraged multiple sources including current contracts, prior programs' financials and other publicly available information to budget program costs. Contingencies were incorporated within all line item expenses to account for unforeseen program costs and future pricing and cost structure uncertainties. Expense estimates will be adjusted as the details of the program and operation are more fully developed.

Table 3 identifies the estimated expenses CalHFA anticipates it will incur to implement the Program. Some of the primary expenses are:

- Staff and consulting services necessary to implement the new program area and associated business processes and compliance and auditing functions
- Initial marketing and outreach efforts
- Formation and operation of a California nonprofit public benefit corporation to administer the HAF funds on behalf of CalHFA
- Development and deployment of an outreach management system, that provides data-driven assessments for outreach planning and targeting, and reporting of subsequent outreach efforts and success metrics
- Development and deployment of a front-end web portal and application management system to provide key documents and forms, assist communication and facilitate the Program's business processes for processing vendors, servicers, homeowners and other stakeholders
- Development and deployment of a back-end application to support ongoing operations, track and report Program performance metrics and provide compliance reporting for the U.S. Treasury

**Table 3: California Mortgage Relief Program Operational Expenses – Implementation Expenses**

| Implementation Expenses | | |
|---|---|---|
| | **Year 1** | **% of Funds** |
| Initial Personnel | $5,390,101 | 0.51% |
| Professional Services (Audit, Legal, etc.) | 196,421 | 0.02% |
| Building Equipment & Technology | 2,401,167 | 0.23% |
| Supplies Miscellaneous | 6,250 | 0.00%* |
| Marketing Outreach / Public Affairs | 1,250,000 | 0.12% |
| Travel (In-State) | 18,750 | 0.00%* |
| **Total Implementation Expenses** | **$9,262,689** | **0.88%** |
| *For percentages that are less than 0.01% but not 0.00%* | | |

The anticipated ongoing administrative expenses for the Program are listed in Table 4. These expenses are based on the assumption that all funds will be allocated within the first 18 months of the Program and that reporting and compliance functions will continue, with lighter staffing, for a period of 15 months after, for a grand total of 36 months (including 3 months of implementation).

Some of the primary expenses are:

- Staffing to support the Program business processes and systems
- Consulting services to support quality assurance, audit, legal, operational processing, call center activities and other operational functions

- Marketing and outreach to servicers, homeowners and other housing stakeholders

- Payment for counseling services for those homeowners where counseling is required

- Director, officer and employee insurance coverage

- Transactional expenses which include credit reports and banking fees

- Fees and subscriptions related to on-going system costs (including IT enhancements)

- In-state travel expenses to support ongoing outreach, training and meetings with other Program stakeholders

**Table 4: California Mortgage Relief Program Operational Expenses – Administrative Expenses**

| Administration Expenses | | | | | |
|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Total | % of Funds |
| Staffing | $15,050,885 | $16,731,376 | $6,685,433 | $38,467,694 | 3.64% |
| Key Business Partners On-Going | 21,706,685 | 9,124,256 | 198,849 | 31,029,790 | 2.94% |
| Professional Services (Audit, Monitoring, Legal, etc.) | 171,966 | 249,673 | 309,139 | 730,778 | 0.07% |
| Travel (In-State) | 33,750 | 36,563 | 11,250 | 81,563 | 0.01% |
| Building, Leases & Equipment | 234,375 | 312,500 | 312,500 | 859,375 | 0.08% |
| Information Technology & Communications (On Air, CORD, etc.) | 2,687,875 | 1,360,500 | 1,360,500 | 5,408,875 | 0.51% |
| Office Supplies / Postage & Delivery / Subscriptions | 41,953 | 45,449 | 13,984 | 101,386 | 0.01% |
| Risk Management / Insurance | 106,172 | 141,563 | 141,563 | 389,298 | 0.04% |
| Training | 6,250 | 6,250 | 0 | 12,500 | 0.00%* |
| Marketing / Public Relations | 23,625,000 | 8,906,250 | 375,000 | 32,906,250 | 3.12% |
| Transactional Expense: External Counseling | 24,314,079 | 6,078,520 | 0 | 30,392,599 | 2.88% |
| Transactional Expense: Credit Reports | 176,623 | 64,317 | 0 | 240,940 | 0.02% |
| Transactional Expense: Banking | 31,839 | 41,797 | 37,500 | 111,136 | 0.01% |
| **Total Administration Expenses** | **$88,187,452** | **$43,099,014** | **$9,445,718** | **$140,732,184** | **13.33%** |

*For percentages that are less than 0.01% but not 0.00%

Based on CalHFA's understanding of the Program at the time of this proposal, the current estimate for one-time implementation and ongoing operational expenses comprise about ~$150 million, or 14.2%, of the HAF monies allocated to California. Table 5 shows the annual anticipated implementation and operational expenses throughout the expected three years of the Program. Expenses are projected to be significantly heavier in the first year of administration due to costs associated with operations and system development. CalHFA anticipates that as much as 70% of total Program applications could arrive during the first year. Expenses are expected to taper off significantly during the final 15 months of the Program, where responsibilities predominantly include compliance and reporting.

**Table 5: Timeline of Implementation and Operational Expenses**

| Implementation | Year 1 | Year 2 | Year 3 | Total |
|---|---|---|---|---|
| $9,262,689 | $88,187,452 | $43,099,014 | $9,445,718 | $149,994,873 |

## 6.2. Programmatic

CalHFA collected delinquency data from loan servicers to determine reasonable assumptions that underly the funding projections of the Program. The benefit disbursement was derived from the initial delinquency data set, which showed an average PITIA as high as $2,400 for GSE loans on single family residences. The average PITIA was then multiplied by the months between the pandemic declaration, and the expected launch of the Program, or approximately 17 months, to come to a $40,000 benefit disbursement per participant.

CalHFA intends to gather further delinquency data that may change the underlying assumptions that drive the Program's funding projections. Additionally, upon launch of the Program, actual disbursements may deviate from the initial program assumptions. As such, CalHFA provided a sensitivity analysis in Table 6 to demonstrate the change in program participants if benefit disbursement amounts prove to be higher or lower than the initial assumptions.

**Table 6: Program Sensitivity Analysis**

| Program Sensitivity Analysis | Program Assumption | Benefit $ | | |
|---|---|---|---|---|
| | | Low | Middle | High |
| Mortgage Relief Program (MRP) | | | | |
| Estimated Benefit $ | $40,000 | $30,000 | $55,000 | $80,000 |
| Estimated Program DIsbursement $ | 905,494,970 | 905,494,970 | 905,494,970 | 905,494,970 |
| Estimated Program Participants | 22,637 | 30,183 | 16,463 | 11,319 |
| Estimated Program Applications | 45,274 | 60,366 | 32,927 | 22,637 |

CalHFA anticipates a majority of applications and disbursements to occur within the first year of the Program. Program funding for year one and two is projected to be 70% and 30% respectively. Projections assume a $40,000 benefit disbursement per participant for the Program, which will be paid in one lump sum transaction. The program funding schedule can be seen in Table 7.

**Table 7: Program Funding Schedule**

| Program Funding Schedule | Year 1 | Year 2 | Year 3 | Total |
|---|---|---|---|---|
| Mortgage Reinstatement Program (MRP) | | | | |
| Estimated Program Applications | 31,692 | 13,582 | 0 | 45,274 |
| Estimaged Program Participants | 15,846 | 6,791 | 0 | 22,637 |
| Estimated Program Disbursements $ | $633,846,479 | $271,648,491 | $0 | $905,494,970 |
| Percent Disbursed | 70.0% | 30.0% | 0.0% | 100.0% |

# 7. Risk Management and Monitoring

## 7.1. Risk Management

In preparation for the receipt of HAF funding and given the significant public interest surrounding the rollout of the Program, CalHFA recognizes the need for a comprehensive risk management program to ensure Program disbursements are administered properly and adhere to the letter and spirit of the U.S. Treasury guidelines, ARPA legislation, and other state and local laws and regulations. CalHFA has extensive experience administering state and federal housing programs, as well as implementing internal control, quality assurance and compliance programs to improve performance and mitigate risks relating to operations, fraud, reporting and compliance. CalHFA, on behalf of CalHRC, intends to leverage its experience and existing programs covering the Agency's own lending, loan servicing and other business functions to oversee the compliance, quality assurance and quality control programs.

CalHRC, in collaboration with the operations vendor, will establish, document and implement policies, procedures, protocols and internal controls that address Program risks, and streamline processes for administering, tracking, monitoring and recording Program expenses and disbursements. The vendor will leverage the Program's application management system, OnAir, to administer, track, monitor, record and report disbursements on a centralized, secure end-to-end platform. Expense and reimbursement processes will be established and implemented outside the platform by vendor professionals and monitored through CalHRC's corporate governance structure. Furthermore, the OnAir system will ensure that Program resources are not over-allocated. Commitments will be monitored at the program level and reservations will be tracked to limit the amount of assistance any one household may receive.

OnAir will also integrate with CalHFA's back-office system, Microsoft Dynamics, to seamlessly facilitate disbursement bookings and aid in the preparation of financial reports. CalHRC will track and monitor Program expenses and disbursements in a manner that is consistent with the administration of prior federally funded programs, and in accordance with applicable 2 CFR Part 200 requirements and U.S. Treasury guidelines. Expenses will be closely monitored and tracked against the U.S. Treasury-approved budget to ensure consistency with 2 CFR Part 200 principles and mitigate the risk of misappropriation.

**Quality Assurance Program**

An external independent quality assurance vendor will design a program to monitor the administration of the HAF monies, which will operate independently from the day-to-day operations teams. The assurance program will test eligibility and application review processing to measure, report and identify improvement opportunities with respect to adherence with policies, procedures, productivity, guidelines and quality standards set by management. When appropriate, respective program management and operations managers will leverage quality assurance results to develop action plans designed to address any findings regarding a policy, procedure, control and/or system deficiency.

**Quality Control Program**

CalHRC will also assemble an independent quality control team consisting of a director and two supporting staff members. The team will design and implement a program to audit the administration of the program, which includes, but not limited to, its policies, procedures and internal controls. CalHFA will use a detailed quality control scorecard to audit the Program's activities to identify areas for improvement and provide quality risk management. Each month, a percentage of approved applications will undergo a complete quality control audit, which will include an independent verification of all aspects of Program requirements. The audit helps ensure the Program remains compliant with Program requirements and all federal, state and local laws, including but not limited to, the Equal Credit Opportunity Act and the Fair Housing Act.

**7.2.  Internal Controls**

CalHRC will leverage its prior program experience to oversee the development and implementation of the Program's internal controls. The Program's operational vendor will design internal controls around significant program risks identified through experience, prior programs, management and/or consultants. Significant risk categories identified include but are not limited to:

- Eligibility
- Disbursement
- Administration
- Information Security
- Compliance
- Systems
- Fraud
- Accounting

The initial set up of internal controls will be reviewed by management and the external independent quality assurance vendor to ensure controls are reasonably designed to minimize the risks above,

mitigate conflicts of interest, and maximize operational efficiency and effectiveness in accordance with program guidelines, ARPA and other applicable state and local laws and regulations.  An external independent auditor will also perform annual testing and provide an opinion on the effectiveness of internal controls.  Additionally, CalHFA will review key vendors and partners' Program activities by carrying out the following:

- Review policies, procedures and internal controls for compliance with U.S. Treasury guidelines and ARPA requirements.
- Test program processes for adequate controls prior to and during the program operation.
- Evaluate Program's compliance with audit requirements under the U.S. Office of Management and Budget's (OMB) 2 C.F.R. Part 200 and applicable appendices.
- Recommend and implement process improvements and other compensating controls.
- Perform random monthly audits of Program files – lenders will be contacted with the list of files selected for review and will be required to submit copies of the homeowner program files.

### Fraud Prevention

CalHRC and its vendors will make every effort to design and implement anti-fraud controls to identify fraudulent practices and/or entities and ensure the proper administration of disbursements. The necessity of fraud prevention was reinforced by feedback CalHFA received from stakeholders. Key elements to a quality fraud mitigation program include:

- Diagnose operational vulnerabilities for fraud.
- Detect gaps in anti-fraud controls.
- Recommend and implement mitigating anti-fraud controls.
- Continuously monitor anti-fraud controls.
- Investigate, verify and report any suspected fraudulent activity in a timely manner.

CalHRC and its operations vendor will emphasize validating, verifying and reviewing information provided by applicants, servicers, mortgage originators and other outside organizations that are party to program transactions. CalHRC will disseminate fraudulent activity and other related information to the U.S. Treasury and other respective fraud prevention groups such as the Federal Trade Commission, Federal Bureau of Investigation, and the Financial Crimes Enforcement Network.

### 7.3.  Compliance

CalHRC will employ a comprehensive compliance approach that leverages the documented policies, procedures, protocols and internal controls to comply with all U.S. Treasury guidance, and applicable

state and local rules and regulations, including but not limited to, allowing compliance and oversight by the U.S. Treasury, the Comptroller General of the United States, Government Accountability Office, Congressional Oversight Panel, and the U.S. Treasury Office of Inspector General, as applicable. Key to an effective compliance program is the monitoring of adherence to these established policies, procedures and internal controls, which will be accomplished through strong corporate governance, and quality assurance, quality control and anti-fraud programs. CalHRC will:

- Develop comprehensive quality assurance and control programs, and implement internal controls to minimize risks relating to operations, fraud, reporting and compliance, while maximizing operational efficiency and effectiveness.

- Establish a robust monitoring system and associated governance structure to easily identify and document noncompliance, and recommend and implement corrective actions quickly.

- Encompass CalHFA and nonprofit entity, CalHRC, and any other key stakeholder involved in these programs, including, but not limited to, participating servicers, applicants, vendors and professional service providers.

- Upon request, provide federal access to general ledgers, communications and records relating to the use of federal funds given to CalHFA.

- Annually test, certify and provide an independent opinion of the effectiveness of internal controls to the U.S. Treasury.

- Assess, prior to program launch, that CalHFA has taken appropriate steps to meet Program objectives and requirements under 2 CFR. Part 200 and the U.S. Treasury.

## 8.  Conclusion

In addition to complying with the requirements of ARPA, CalHFA will require that it and its servicers participating in the Program comply with the Equal Credit Opportunity Act, the Fair Housing Act and California Government Code Section 12955, which prohibit discrimination in connection with mortgage transactions. CalHFA will ensure that it and its servicers do not treat a mortgagor less favorably than other mortgagors on grounds such race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, marital status, national origin, ancestry, familial status, source of income, disability, veteran or military status, or genetic information in connection with any loan modification. These laws also prohibit redlining. As stated throughout this Proposal, CalHFA is required to obtain an independent verification that proper controls be in place and maintained prior to and during Program implementation. CalHFA will hire a qualified audit vendor to perform this function.

CalHFA believes the California Mortgage Relief Program outlined in this Proposal will offer California homeowners, their lenders and servicers, as well as other stakeholders affected by the pandemic-related economic crisis, the unique opportunity to leverage federal funds to help keep homeowners in their homes and prevent foreclosures resulting from pandemic related hardships.

**Appendix A**

**California Mortgage Relief Program ("Program") Term Sheet**

| | |
|---|---|
| **Brief Description** | • The U.S. Treasury first issued guidance for the use of the HAF funds on April 14, 2021. As an eligible entity that was approved to participate in HAF, CalHFA entered into a Financial Assistance Agreement with Treasury and received 10% of California's total allocation amount on June 22, 2021. In August 2021, CalHFA will run a pilot phase of the Program using funds from that initial allocation of California's HAF funds. Running this pilot will allow CalHFA to do an end-to-end test of the Program, setting up the process with mortgage servicers, while targeting assistance to California homeowners with the most urgent need. Following this pilot phase, CalHFA will make any necessary process enhancements. With Treasury's approval of this Proposal, CalHFA will then launch the Program in full to serve as many vulnerable homeowners as possible using the full HAF allocation of $1.05 billion. |
| **Mortgage Reinstatement Program Goal** | • To assist in preventing foreclosures and keeping people in their homes by providing financial assistance to Eligible Homeowners in California to eliminate past due payments from mortgage servicers. |
| **Size of Mortgage Reinstatement Program** | • The initial allocation of HAF funds is approximately $100 million.<br>• A successful final approval from U.S. Treasury would increase the final allocation of HAF funds to approximately $1 billion. A request to amend this program may be made, based on the early and constant monitoring and reporting of results against goals. |
| **Targeting and Outreach** | • CalHFA will affirmatively target socially disadvantaged and vulnerable homeowners using a data-driven approach including metrics such as the Owner Vulnerability Index (by UCLA), Qualified Census Tracts and home loan data from the FHA, VA and USDA. This will include data-driven targeted marketing and community engagement along with engaging housing counselors, as well as using levers in the program design to ensure that outcomes effectively prioritize socially disadvantaged individuals. |

| | |
|---|---|
| **Eligible Homeowners** | • Homeowner must currently own and occupy the property in California as their primary residence.<br>• Homeowner must meet the Homeowner Income Eligibility Requirements.<br>• Homeowner must own and occupy not more than one property.<br>• Homeowner must attest that they experienced a financial hardship after January 21, 2020.  The attestation must describe the nature of the financial hardship.<br>• The original, unpaid principal balance of the homeowner's first mortgage loan, at the time of origination, was not greater than the conforming loan limit in effect at time of origination.<br>• Co-owners are not permitted to separately apply for the Program assistance.<br>• Receiving other forms of governmental assistance, including other forms of COVID-19 assistance from the CARES Act, Consolidated Appropriations Act of 2021 or the American Rescue Plan Act, does not disqualify a household from the California Mortgage Relief Program. |
| **Eligible Legal Ownership Structures** | • Those where the home is owned by a "natural person" (i.e., LLP, LP or LLC do not qualify)<br>• Those where the homeowner has transferred their ownership right into non-incorporated, Living Trusts, provided the homeowner occupies the home as the primary/principal residence. |
| **Qualified Financial Hardship** | • A "Qualified Financial Hardship" is a material reduction in income or material increase in living expenses associated with the coronavirus pandemic that has created or increased a risk of mortgage delinquency, mortgage default, foreclosure, or displacement for a homeowner.<br>  » **Reduction of Income** – Temporary or permanent loss of household earned income after January 21, 2020.<br>  » **Increase in Living Expenses** – Increase in out-of-pocket household expenses such as, medical expenses, inadequate medical insurance, increase in household size, or costs to reconnect utility services directly related to the coronavirus pandemic after January 21, 2020.<br>• Homeowner must complete and sign the Affidavit which includes an attestation of Qualified Financial Hardship. |
| **Homeowner Income Eligibility Requirements** | • To be eligible for assistance, all homeowners who are on the mortgage must have a collective income equal to or less than 100% of the Area Median Income adjusted by household size. |

| | |
|---|---|
| **Homeowner Prioritization** | • CalHFA will prioritize funding to the following populations:<br>» Target socially disadvantaged and vulnerable homeowners using a data-driven approach including metrics/data such as Owner Vulnerability Index (UCLA) and Qualified Census Tract (HUD).<br>» A percentage of the allocated funds will be reserved for socially disadvantaged and vulnerable homeowners using a data-driven approach, including metrics/data such as OVI and QCT, or if the applicant has an FHA, VA, or USDA government home loan. |
| **Eligible Properties** | • "Eligible Properties" are:<br>» Single-family (attached or detached) properties<br>» Condominium units<br>» 1-unit owner-occupied<br>» Manufactured homes permanently affixed to real property and taxed as real estate<br>• "Ineligible Properties" are:<br>» Vacant or abandoned<br>» Second homes<br>» Investment property |
| **Eligible Uses of Mortgage Reinstatement Program Proceeds** | • Existing first mortgage lien loan payment (principal, interest, taxes and insurance), plus any escrow shortages to fully reinstatement the mortgage to a "current" status.<br>» For loans with no impound accounts and delinquent property taxes, borrowers must establish an impound account with their servicer for delinquent property taxes to be paid<br>» Must be at least two payments past due at time of application for assistance<br>» Delinquency must occur prior to the launch date of this proposed Program<br>• Exclusions:<br>» Any loan already being considered or approved for a partial claim or modification is ineligible |
| **Maximum Per Household** | • CalHFA will not exceed its "Maximum Per Household" amount of $80,000 per household in the proposed Program.<br>• Assistance is limited to one-time, per household for the proposed Program. |
| **Assistance Type** | • Assistance will be structured as a non-recourse grant. |

| | |
|---|---|
| **Payout of Mortgage Reinstatement** | • CalHFA will disburse Mortgage Relief assistance directly to mortgage servicer.<br>• CalHFA will make no more than one disbursement to each payee.<br>• CalHFA will disburse the amount quoted by the servicer; any discrepancies to be resolved by the homeowner and servicer. |
| **Structure of Assistance and Payment Process Description** | • Homeowners who are on the mortgage must meet one of the three paths <u>and complete an informational attestation on the loan portal:</u><br>   » Greater than a 40% Housing to Income ratio<br>   » Less than or equal to 40% Housing to Income ratio <u>and</u> process a denial of alternative work out options from the servicer excluding short sale and deed in lieu<br>   » Currently receiving and have proof of Income Proxy such as Unemployment, Medi-Cal, WIC, SNAP, FDPIR, TANF, SNP, Section 8 and any other income, based county, municipality, state and or federal assistance program (Public Assistance).<br>• Note:  reinstatement will include all escrows currently managed by the mortgage servicer per eligible uses. See above. |
| **Program Launch** | • CalHFA is planning to launch the pilot phase of the program in August 2021. |
| **Program Duration** | • The period of performance for the HAF award begins on the date hereof and ends on September 30, 2026. HAF recipient shall not incur any obligations to be paid with the funding from this award after such period of performance ends.<br>• CalHFA plans to allocate all funds by September 30, 2025. |
| **Program Application Process** | • Applications will be accepted online through the Outreach Navigator and Intake Review (ONAIR) Portal. All applications will be entered into the online portal and reviewed on the reviewer portal. |

| | |
|---|---|
| **Required Application Documents** | In response to public feedback about the need for a streamlined application process, efforts will be made to avoid barriers to equitable access and allow for flexibility, particularly with regard to documentation requirements.<br><br>Required application documents include, but may be limited to, the following:<br><br>• California Mortgage Relief Program application<br>• Affidavit which includes an attestation of the Qualified Financial Hardship<br>• Third Party Authorization (TPA) and Disclosure Form<br>• Mortgage Statement for first mortgage<br>• Valid California identification and Social Security Number<br>• Income documentation: W2's, paystubs, previous years' tax returns or alternative income documents as applicable such as proof of an Income Proxy such as Unemployment, Medi-Cal, WIC, SNAP, FDPIR, TANF, SNP, Section 8 and any other income-based county, municipality, state and or federal assistance program (Public Assistance)<br><br>*Additional Documentation Requirements in Certain Cases*<br><br>In certain cases, CalHFA will require additional documentation to ensure that assistance is focused on Californians most in need and is delivered efficiently.<br><br>• Homeowners that have a Housing to Income ratio of less than or equal to 40%, and are not on public assistance, will need to provide a denial of alternative workout from their servicer<br>  » This additional requirement is needed to ensure that Program assistance is focused on the most vulnerable households that do not have other loss mitigation options. This is in accordance with U.S. Treasury guidance that directs states to "avoid using assistance in a manner that replaces other loss mitigation resources that otherwise would be available."<br>• Homeowners who have previously filed for bankruptcy, but who are no longer in active bankruptcy must provide proof of a court ordered "discharge" or "dismissal"<br>• Homeowners in active bankruptcy will need to provide written substantiation from both their loan servicer and the Bankruptcy Trustee that the homeowner(s) may receive mortgage assistance funds and said funds shall be applied to any first lien loan arrearage on their primary residence<br>  » This additional documentation requirement allows CalHFA a more efficient path to reinstatement for those homeowners by ensuring that the mortgage servicer and bankruptcy trustee will accept the assistance funds |
| **Program Partners Requirements** | • Servicers will be required to execute a HAF Partner agreement and agree to communicate using the Common Data File (CDF) format to be provided by Treasury.<br>• If and as required, partners will be asked to sign a W9. |

**Appendix B**

## California Mortgage Relief Program Public Feedback Analysis

SUMMARY

CalHFA received public feedback and recommendations for the state's HAF program through hosting three virtual listening sessions, an online survey and email submissions. The public notice and invitation to comment was posted on CalHFA's website on June 9, 2021. The listening sessions concluded on June 17 and the online survey closed on June 18. The public is free to continue providing feedback through email submission.

*Respondents and comments as of June 20, 2021:*

| Feedback Method | # Participants / Respondents | # Comments Recorded |
|---|---|---|
| Listening Session #1 | 95 | 25 |
| Listening Session #2 | 67 | 18 |
| Listening Session #3 | 51 | 14 |
| Email Submission | 9 | 4 |
| Survey | 93 | |
| **Total** | **315** | |



**PUBLIC FEEDBACK BY TYPE**

■ Public Listening Session   ■ Survey   ■ Email Submission

3%
29%
68%

CalHFA heard from several key organizations. Listening session comments and survey and email responses included feedback from the president and CEO of Neighborhood Housing Services of Los Angeles County, the CEO of California Mortgage Bankers Association, the president of the National Reverse Mortgage Association, a senior staff attorney for the National Housing Law Project, a senior attorney for Housing and Economic Rights Advocates, the United Homeowners Association, Faith and Community Empowerment, and several HUD approved housing counselors and agencies.

| Key Organizations |
| --- |
| National Reverse Mortgage Lenders Association |
| Joseph and Cohen Law Firm |
| Faith and Community Empowerment |
| NeighborWorks |
| Housing and Economic Rights Advocates |
| National Housing Law Project |
| Legal Aid Society of San Diego |
| California Rural Legal Assistance |
| Celink |
| Center for Responsible Lending |
| United Homeowners Association |
| Homeownership OC |
| PennyMac Loan Servicing |
| Fidelity Bank N.A. |
| Project REACh Los Angeles |
| California Mortgage Bankers Association |
| Neighborhood Housing Services of Los Angeles County |

**Frequently Discussed Topics**

Along with the general urgency for the program expressed by both homeowners and advocates, the most discussed issues included eligibility inclusion, other financial assistance, barriers to participation, and effective outreach methods.

*Topics as of June 20, 2021:*



## Public Listening Sessions

CalHFA received public feedback on the HAF program over the course of three listening sessions. One session was specifically focused on input from Tribal community members.

**Eligibility Inclusion and Other Financial Assistance**

One frequently identified topic was eligibility inclusion. Several participants suggested that homeowners with reverse mortgages should qualify for assistance under the HAF program. Other common suggestions for inclusion were homeowners with PACE liens, those who have declared bankruptcy due to the coronavirus, those with trial modifications, and those who own manufactured, mobile, or not affixed homes. Participants also suggested that financial assistance be offered for other homeowner expenses, such as HOA fees, property taxes, utilities, and different types of insurance.

**Barriers to Participation**

On barriers to participation, participants spoke about the challenges of meeting all the documentation requirements, including showing proof of sustainability. Participants said they hoped the application process and documentation requirements would be simplified and streamlined, especially for non-English speakers, seniors, those with disabilities and those who do not have easy access to the internet. In addition, they suggested offering other ways of applying for assistance available, such as through paper applications and a mobile app.

**Marketing and Outreach**

In terms of marketing and outreach, many participants encouraged the agency to partner with Community Based Organizations (CBOs), faith-based organizations, and other culturally competent groups to conduct outreach to the target populations. These organizations are seen as trusted members  of the community and will be crucial in urging qualifying homeowners to apply to the program. Providing authentic communications and outreach will also be important.

Another key takeaway on outreach methods was the importance of translating materials in more conversational forms of different languages rather than using formal translations through automated programs such as Google Translate. Several participants mentioned that many in target communities often cannot understand formally translated materials or applications used by government programs. Participants also encouraged the agency to partner with ethnic media sources and publications to reach the target populations.

## Online Survey

The survey designed by CalHFA contained eight questions and an opportunity for respondents to give open-ended feedback. 93 respondents participated in the survey during the public comment period, with 47 offering open-ended comments and suggestions.

**Respondent Roles (92 answered)**

75 percent of respondents were members of the public/homeowners, with the rest of the respondents representing other stakeholders, such as legal aids, housing counselors, loan servicers, mortgage lending, local government/local housing authority and nonprofit housing agencies.



Prioritizing Use Of Funds (Rank in Order of Importance)



**Marketing and Outreach (92 answered)**

On outreach, respondents identified digital ads and social media, news reports, TV and radio, and nonprofits and CBOs as the best ways to reach traditionally underserved communities. In addition, several respondents independently suggested using direct mail.

**Barriers to Participation (78 answered)**

Respondents identified similar barriers to participation as participants in the listening sessions, including documentation requirements, lack of access to technology, limited English proficiency, and a complicated and overwhelming application process.

**Treasury Eligibility Guidelines (66 answered)**

Overall, respondents agreed with the financial qualifications and focus on socially disadvantaged individuals. Some stressed the importance of considering each applicant's circumstance and situation when evaluating their eligibility. Others said all homeowners need help as soon as possible. Respondents also suggested that the most effective ways to reach the target populations was through partnering with CBOs and local governments and holding community events.

**Prioritizing Use of Funds and Sustainable Outcomes (91 answered each question)**

Mortgage payment assistance and reinstatement of all delinquent mortgage payments ranked as the highest priority for the use of program funds. Other homeowner expenses such as utilities and internet, and delinquent property taxes ranked second and third in priority, respectively.

Almost 70 percent of respondents said that funds should prioritize sustainable outcomes, particularly the ability for homeowners to remain in their property with a mortgage payment they can afford. About 25 percent of respondents said it depends on factors such as sustainable employment and income.

**Assistance for Property Types (60 answered)**

Respondents offered mixed recommendations for which property types should receive assistance from the program. While many said that all listed property types should be given assistance, some recommended that single family homes and owner-occupied properties should be prioritized. Several respondents also recommended that assistance be given to homeowners with mobile homes not affixed to real property.

**Operational Efficiency (67 answered)**

Most respondents said that there must be clear instructions on how and where to apply to the program, simplified documentation requirements, and an easy to navigate program website. By and large, respondents said to make the process as simple as possible. Some respondents offered similar suggestions heard during the listening sessions, such as working with housing counselors and partnering with community groups to assist with the application process.

### Email Submissions

As of June 29, 2021, CalHFA has received 13 email submissions regarding the HAF program, including 6 from private citizens and 7 from housing advocates and other stakeholders. A HUD certified housing counselor encouraged working directly with HUD agencies that already have a pipeline of clients who need assistance. Two struggling homeowners described their challenges with health issues and financial hardships due to COVID-19.

Steve Irwin, who is President of the National Reverse Mortgage Lenders Association and who also offered feedback during the first listening session, submitted a formal comment letter outlining specific recommendations to ensure homeowners with reverse mortgages are eligible for assistance from the program. In addition to eligibility, the letter also recommended the program clarify that liens that are required for any assistance structured as a forgivable loan will not impair the lien position of any existing mortgage, allow non-borrowing spouses to obtain HAF relief, allow HAF funds to pay for imminent property charges and pay to reinstate homeowner insurance policies, allow for self-attestation of hardship, have flexibility for required proof in support of loss mitigation sustainability, and allow loan sub-servicers to communicate with CalHFA and receive HAF funds on behalf of a master servicer.

Other stakeholders and advocates have also provided feedback via email. Lori Gay, President and CEO of Neighborhood Housing Services of Los Angeles County, provided information and data from Los Angeles County's Mortgage Relief Program that her organization is managing. California Mortgage Bankers Association president and CEO Susan Milazzo sent a letter with suggestions that included using a targeted and prioritized approach, coordinating with other states' HAF programs, complimenting existing state programs, streamlining payments using the existing infrastructure from the state's HHF program, being flexible, and educating potential applicants through mortgage servicers. In addition, Dennis Santiago with Project REACh Los Angeles provided information on the organization's equity share bridge program and the work they have done to explore different implementation pathways.